**METROPOLITAN DEVELOPMENT AND HOUSING AGENCY**

v.

**James K. EATON, et al.**

Court of Appeals of Tennessee, at Nashville.

June 27, 2006 Session.

Oct. 13, 2006.

Permission to Appeal Denied by Supreme Court Feb. 26, 2007.

James W. Fisher, Jr., Goodlettesville, Tennessee; Michael J. Passino, Nashville, Tennessee, for the appellants, James K. Eaton and Toni C. Eaton.

G. Brian Jackson and David L. Johnson, Nashville, Tennessee, for the appellee, Metropolitan Development and Housing Agency.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Landowners appeal the trial court's denial of their Motion to Alter or Amend filed under Tennessee Rule of Civil Procedure 59.04. The Motion was filed after a jury awarded $504,000 as damages for the condemnation of their property. The condemnation action was brought in the context of executing the "Phillips–Jackson Redevelopment Plan" drafted by the Metropolitan Development and Housing Agency (MDHA) and approved by the Metro Council. Landowners argue that the trial court abused its discretion by denying the Motion and erred in entering the original possession order. They also argue that various steps taken by MDHA resulting in an amended trial court order operated to void the taking and that the proceedings were an invalid exercise of MDHA's eminent domain powers. We affirm the trial court.

### I. THE PHILLIPS–JACKSON STREET REDEVELOPMENT PLAN AND THE EATON PROPERTY

James K. Eaton and his wife Toni owned three parcels of land totaling one-half acre in the downtown area now known as "Row 8.9." The Eatons purchased the three parcels as a unit, and until 2001 the Eatons had operated Eaton's Auto on the property for 22 years. In 1993 the Metropolitan Development and Housing Agency (MDHA) drafted the Phillips–Jackson Street Redevelopment Plan, the objectives of which included developing the Row 8.9 subarea to improve the blighted properties on Eighth and Ninth Avenues North between Phillips and Jackson Streets near what is now the Bicentennial Mall. By Ordinance 093–773, the Metropolitan Government of Nashville and Davidson County approved the plan and authorized the acquisition of property in implementing the plan. The plan stated the following objectives and action to be taken:

## 2. REDEVELOPMENT PLAN OBJECTIVES

The specific provisions and actions incorporated in the Plan have been developed and are necessary to achieve the following objectives:

a. To establish harmonious land use patterns and provide sites adequate for the planned development of new residential, commercial uses and institutional areas.

b. To provide for redevelopment of the Project Area, wherein non-conforming or deleterious land uses and the present subdivision and ownership of land precludes the orderly assemblage and desired changes in the use of land.

c. To eliminate substandard housing through acquisition and demolition or through a conservation program for the rehabilitation of existing residences where feasible and compatible with the Land Use Plan.

d. To clear and provide for redevelopment of portions of the Project Area in which a change in type or intensity of land use is necessary. Within these areas, it may be required, and is within the objectives of this Plan, that certain buildings which are not structurally substandard may be acquired and demolished.

e. To establish standards and guidelines for the redevelopment and continued use of the area which will assure adequate light, air, open-space, off-street parking, and the future stability of the entire area through quality development.

f. To provide for the relocation of businesses and residents where necessary to accomplish the objectives of the Plan.

g. To eliminate and prevent the recurrence of blight.

h. To eliminate vacant lots by monitoring development and actions encouraging effective and desirable uses of land in accordance with the Plan.

I. To revitalize the commercial uses on Jefferson Street and 8th Avenue North and provide land for new commercial establishments and services necessary to support adjacent residential areas.

j. To provide for the layout of new streets, pedestrian ways and other public improvements necessary to support the redevelopment of the area.

k. To enhance the neighborhood preservation goals, particularly in the Germantown and Buena Vista National Register Historic Districts and the Phillips–Jackson Street neighborhood southwest of the intersection of Eighth Avenue North and Jefferson Streets.

## 3. PROPOSED REDEVELOPMENT ACTIONS

The ultimate objective of the Land Use Plan is to create an environment conducive to the development and improvement of commercial and residential neighborhoods in the vicinity of the Bicentennial Mall, a project of the State of Tennessee. The various proposals of the Plan have been adopted to remove the conditions which have created or contributed to the substandard character of improvements and social conditions in the Project Area and restore the vitality of the area through redevelopment and rehabilitation. It is intended that these actions will be implemented over time and be coordinated with the needs of existing businesses and residents so

that undue hardship or displacement is minimized. Where displacement or relocation is necessary, businesses or residents should not be forced to relocate until suitable replacement properties are found and a reasonable time is permitted for relocation. Specific actions necessary to achieve these objective[s] of area improvement are:

a. The acquisition of land through negotiation, condemnation, or otherwise for public purposes; for private infill development where the condition of title, the diverse ownership of real property to be assembled, street or lot layouts, or other conditions prevent a proper development of the property in accordance with the Land Use Plan and neighborhood needs; and for the purpose of removing, preventing, or reducing blight.

b. Demolition, clearance and relocation as necessary within the Project Area to achieve the objectives of the Plan.

c. Closing, vacating, or relocating various streets, alleys, pedestrian ways, or utilities.

d. To provide for and construct improved streets, alleys, public facilities, open spaces, and pedestrian ways.

e. Negotiation of agreements with developers to undertake redevelopment of property in accordance with the Land Use Plan.

The Eatons do not challenge the process by which the Phillips–Jackson Street Plan was considered and initially adopted. Indeed, they do not challenge the characterization of the property surrounding them as "blighted" as that term is defined by statute. The Eatons appeal the process by which MDHA condemned their particular parcels for inclusion in the redevelop-

ment plan, and the steps the agency took after the original order of possession, which they allege constitute an illegal effort to circumvent their right to develop their own property.

## II. THE EXERCISE OF EMINENT DOMAIN AND THE INTERLOCUTORY APPEAL

The adoption of the Phillips–Jackson Street Redevelopment Plan in 1993 and its amendment in 1999 did not affect the Eatons' property immediately. Acquisitions progressed as funds became available. By February of 2001, MDHA, which had partnered with the non-profit developer Affordable Housing Resources, Inc. (AHR), was poised to acquire the three parcels which are the subject of this law suit. According to testimony at the 2001 condemnation hearing, Mr. Eaton first noticed an article in the Valentine's Day 2001 issue of *The City Paper* describing MDHA's efforts in redeveloping the area encompassing his property. According to Mr. Eaton, this article was the first he knew of the perils immediately posed to his property by the Phillips–Jackson Street Plan. Mr. Eaton then contacted MDHA to confirm the story. On February 16, 2001, Joseph B. Cain, senior real estate officer at MDHA, informed Mr. Eaton by letter that his property was marked for condemnation for redevelopment purposes:

Dear Mr. Eaton:

Affordable Housing Resources, Inc., working through Ms. Vicki Saito and Grubb Ellis–Centennial Properties has attempted to acquire your property located on 8th and 9th Avenues North. The Metropolitan Development and Housing Agency, per the Board Meeting of February 13, 2001 voted to partner with Affordable Housing Resources, Inc. to redevelop the site between 8th and 9th Avenues N. which include your property listed above.

Your property is located in the Phillips–Jackson Redevelopment Area, and as such is subject to acquisition by MDHA for redevelopment purposes. Should we not be able to reach an agreement to acquire your property, MDHA will take your property by eminent domain and it will be necessary for you to move.

On April 5, 2001, Mr. Cain, accompanied by the director of development at MDHA, met personally with Mr. Eaton. At this meeting, the following letter was hand delivered:

Dear Mr. Eaton:

We have received the fair market value of your property listed above from the appraisers. Based on these values, we are offering to purchase your property for $310,000. Please consider this offer and let me know of your decision to accept or reject the offer. If we are unable to mutually agree upon a purchase price, MDHA will file eminent domain procedures to acquire the property.

Please call me to discuss the offer. I may be reached at 252–8404. If I do not hear from you within 10 days, we will assume you have rejected our offer.

Additionally, this letter is to serve as official notice to vacate the property. Effective today, you have 90 days to vacate the property (July 5, 2001). You had mentioned that you have another lot onto which you may move your inventory. Should you need assistance in locating a new site, I will be available to assist you in finding a new site. We will need access to your property to estimate the relocation costs of your inventory and personal property from the building.

Mr. Eaton rejected the $310,000 offer. From the conversations with MDHA until the eventual filing of MDHA's Notice of Condemnation in Circuit Court, Mr. Eaton has maintained his desire to retain owner-

ship of the property in question and his willingness to attempt development of the property himself in accordance with the Phillips–Jackson Plan. Nevertheless, according to Mr. Cain's testimony at the possession hearing, the acquisition of Mr. Eaton's property was necessary because of its visibility and role in the overall development plan. Upon direct examination, Mr. Cain gave the following reasons:

Q Why was the Eaton property designated for acquisition in the Phillips Jackson Plan?

A That block right there consists of quite a bit of vacant property. It's a fairly strategic piece of property. It's on 8th Avenue. It has good visibility. That property is directly across the street from what was the proposed Bicentennial Mall and it's become the Farmers Market. And since it was essentially vacant property, we thought that that would be a good sight for redevelopment and that the property would, due to the diversity of ownership, need to be assembled together. And the whole block was put into acquisition.

Q What do you mean by the diversity of the ownership?

A Approximately—the portion that we are currently acquiring for the proposed project, which involves Mr. Eaton's property, there are, I believe, seven different property owners. Quite a few of those parcels are small, as small as 30 feet in street frontage, and it's nearly impossible to assemble property together without the authority that the housing authority has to acquire by eminent domain.

Mr. Eaton recognized the strategic importance of his property from his own 22–year ownership experience. In addition, according to his testimony, Mr. Eaton owned several pieces of property in Downtown Nashville besides these subject parcels, and had previously dealt with MDHA not only concerning his sale to that entity of an adjacent parcel, but also concerning his renovation of other properties in partnership with MDHA. In the course of his discussions with Mr. Cain, Mr. Eaton specifically referenced Tennessee Code Annotated section 13–20–105 and asked whether that statute afforded the Eatons any remedy in the form of an opportunity to develop their property.

A I called Mr. Kane[1] and told Mr. Kane that I had a law that I did not understand and would like for him to interpret it. And I gave him the law number and he said, "Well, that gives us the right to take your property." And I said, "I am not talking about the—the other one. The—whatever the number was on the other law. He was not aware of it at that time and he said he would look it up in a couple of hours.

Q Okay. Just tell the court what you did and whether you ever presented that sheet of paper to Mr. Kane?

A Well, he didn't call me back. I called him back two days later and he said he told the attorney to look over it that he was not for sure what it meant.

Q Did you ever present that document to Mr. Kane or show it to him?

A In our meeting on April 5th, I showed Mr. Kane and Phil Ryan a copy of this law and they said it didn't pertain to this property.

Section 105, in fact, provides the following:

**13–20–105. Private property—Taking by eminent domain restricted under certain conditions.**—A housing authority created under this chapter shall not have the power to take by eminent do-

---

**1.** In the hearing transcript, Mr. Cain's name is spelled phonetically.

main private property in an urban renewal area for the purpose of resale, if the owner of same desires to develop such owner's own property and if the designated reuse of the property in the urban renewal plan is such that the owner's parcel can be redeveloped by itself without affecting the objectives of the urban renewal plan as to the owner's parcel or adjoining or adjacent properties thereto, and the owner signs an agreement with the housing authority to abide by the urban renewal plan, in any development thereof. [Act 1972, ch. 711, § 1; T.C.A., § 13–833.]

Tenn.Code Ann. § 13–20–105.

MDHA filed its petition on April 11, 2001, seeking expedited procedures under Tennessee Code Annotated section 29–17–401 *et seq.* On May 21, 2001, the Eatons responded to the petition arguing that MDHA did not have the power to take their property for transfer to AHR in light of the Eatons' expressed intent to develop the property themselves. *See* Tenn.Code Ann. §§ 13–20–104(a)(17) and 13–20–105. On May 24, 2001, the trial court conducted a possession hearing. Judge Haynes awarded MDHA possession of the property. The trial court's order entered June 25, 2001, contained the following specific findings:

1. MDHA is a public development and housing authority created and existing pursuant to the Tennessee Housing Authorities Law, T.C.A. § 13–20–101, *et seq.*

2. MDHA is vested with the power of eminent domain pursuant to T.C.A. § 13–20–101, *et seq.* and T.C.A. § 29–17–401 *et seq.*

3. The Eatons are residents of Franklin, Williamson County, Tennessee and are the owners of the Eaton Property.

4. The Eatons have operated "Eatons Auto", a used car lot on the Eaton Property for twenty-two (22) years.

5. In 1993, the Metropolitan Government for the City of Nashville, Davidson County, enacted ordinance number 093–773 approving the Phillips–Jackson Street Redevelopment Plan (hereinafter the "Phillips–Jackson Street Plan").

6. The Phillips–Jackson Street Plan is a "redevelopment project" within the meaning of T.C.A. § 13–20–202(a).

7. The Phillips–Jackson Street Plan was amended as recently as 1999.

8. The Eaton Property is located within the boundaries of the Phillips–Jackson Street Plan.

9. Since the enactment of the Phillips–Jackson Street Plan, the business operated by the Eatons on the Eaton Property has not been a permitted use under the Phillips–Jackson Street Plan.

10. The Eatons as owners of Property located within the boundaries of the Phillips–Jackson Street Plan were sent written notice in 1993 when the Plan was enacted and again in 1999 when the Plan was amended that their Property was subject to the Phillips–Jackson Street Plan and targeted for acquisition in accordance with the Plan.

11. MDHA informed the Eatons in writing in February of 2001 that it intended to acquire the Eaton Property.

12. MDHA's representatives met with James K. Eaton on April 5, 2001 to make an offer to acquire the Eaton Property and provided to the Eatons written notice that they would need to relocate their business by July 5, 2001.

13. MDHA seeks to acquire the Eaton Property in order to assemble it with several other properties as part of the "Row 8.9 Project", which will consist of up to thirty (30) residential condomini-

um units located adjacent to the Hope Gardens neighborhood.

14. The Eaton Property will be assembled with several other small tracts and sold to a private developer that will construct the thirty (30) residential condominium units with amenities and common areas of Row 8.9.

15. One of the "Redevelopment Plan Objectives" of the Phillips–Jackson Street Plan is to provide for the redevelopment of the land within in the Plan area "... wherein non-conforming or deleterious land uses and the present subdivision and ownership of land precludes the orderly assemblage and desired changes in the use of the land."

16. If the Eatons were permitted to develop the Eaton Property in isolation, MDHA would lose the continuity of the development and cost efficiency in redevelopment that comes from the assemblage of small parcels which would frustrate the objectives of the Phillips–Jackson Street Plan.

The Order vested fee simple title to the property in MDHA. From this order, the Eatons filed a Motion for Permission to Appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. That Motion also sought a stay of the action pending appeal. On July 12, 2001, the trial court denied the Motion for Permission to Appeal. The Eatons then sought extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. By order entered August 20, 2001, this Court denied extraordinary appeal. That order contained the following pertinent language:

> Having reviewed both the application and the answer, we cannot conclude that the trial court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review or that an extraordinary appeal is necessary for a complete determination of the action on appeal.[1]

It is, therefore, ordered that the application for an extraordinary appeal be denied. The stay entered on August 8, 2001, shall expire five (5) days following the entry of this order.

James K. Eaton and Toni C. Eaton and their surety are taxed with the costs for which execution may issue.

[1] The Eatons' current business located on the property does not conform to the redevelopment plan and will have to be relocated regardless of whether the Eatons ultimately prevail in an appeal as of right. Contrary to MDHA's assertions, the Eatons cannot be made whole by monetary damages if they ultimately prevail on appeal. *GRW Enterprises v. Davis,* 797 S.W.2d 606, 615 (Tenn.Ct. App.1990) ("Real property is unique, and more often than not, an award of damages is simply not an adequate remedy."). However, they would likely be entitled to regain possession of the property should the trial court's order granting title to MDHA be reversed on appeal.

III. AMENDMENT OF THE POSSESSION ORDER

On November 11, 2001, MDHA filed a Motion to Supplement the Record and to Alter or Amend the June 25 Order, "so as to include reference to a recent amendment of the Phillips–Jackson Street Redevelopment Plan and recently recorded condominium regime overlay documents." Attached to this motion was Metro Ordinance 2001–861. The Eatons responded. The trial court granted the Motion, and its amended order of December 10, 2001 contained the following:

1. MDHA is a public development and housing authority created and existing pursuant to the Tennessee Housing Au-

thorities Law, T.C.A. § 13–20–101, *et seq.*

2. MDHA is vested with the power of eminent domain pursuant to T.C.A. § 13–20–101, *et seq.* and T.C.A. § 29–17–401 *et seq.*

3. The Eatons are residents of Franklin, Williamson County, Tennessee and are the owners of the Eaton Property.

4. The Eatons have operated "Eatons Auto," a used car lot on the Eaton Property for twenty-two (22) years.

5. In 1993, the Metropolitan Government for the City of Nashville, Davidson County, enacted ordinance number 093–773 approving the Phillips–Jackson Street Redevelopment Plan (hereinafter the "Phillips–Jackson Street Plan").

6. The Phillips–Jackson Street Plan is a "redevelopment project" within the meaning of T.C.A. § 13–20–202(a).

7. The Phillips–Jackson Street Plan was amended in 1999 *and again in 2001.*

8. The Eaton property is located within the boundaries of the Phillips–Jackson Street Plan.

9. Since the enactment of the Phillips–Jackson Street Plan, the business operated by the Eatons on the Eaton Property has not been a permitted use under the Phillips–Jackson Street Plan. *Under the 2001 amendment to the Phillips–Jackson Street Plan, the Eaton Property is zoned for residential use.*

10. The Eatons, as owners of Property located within the boundaries of the Phillips–Jackson Street Plan, were sent written notice in 1993 when the Plan was enacted and again in 1999 when the Plan was amended that their Property was subject to the Phillip–Jackson Street Plan. The Plan targeted the Property for acquisition.

11. MDHA informed the Eatons in writing in February of 2001 that it intended to acquire the Eaton Property.

12. MDHA's representatives met with James K. Eaton on April 5, 2001 to make an offer to acquire the Eaton Property and provided to the Eatons written notice that they would need to relocate their business by July 5, 2001. *Mr. Eaton summarily rejected the offer that day.*

13. MDHA seeks to acquire the Eaton Property in order to assemble it with several other properties as part of the "Row 8.9 Project", which will consist of up to thirty (30) residential condominium units located adjacent to the Hope Gardens Bicentennial Neighborhood. *As evidenced by the recently recorded condominium regime overlay documents attached to MDHA's November 21, 2001 Notice of Filing, MDHA will retain ownership over the units located on the Eaton Property until the individual units are sold to private purchasers.*

14. *One of the "Redevelopment Plan Objectives" of the Phillips–Jackson Street Plan is to provide for the redevelopment of the land within the Plan area "... wherein non-conforming or deleterious land uses and the present subdivision and ownership of land precludes the orderly assemblage and desired changes in the use of the land."*

15. If the Eatons were permitted to develop the Eaton Property in isolation, MDHA would lose the continuity of the development and cost efficiency in redevelopment that comes from the assemblage of small parcels which would frustrate the objectives of the Phillips–Jackson Street Plan.

16. Even if the Eatons' proposed uses comported with said redevelopment plan, condemnation is warranted to ful-

fill the compelling interests associated with assemblage as set forth above.

(emphasis added to indicate additions and changes to the June 25, 2001 order.)

Judge Haynes then recused herself on June 25, 2002. After four years and two judges, a jury eventually awarded $504,000 as damages for the Eaton property. The Eatons then filed their Motion to Alter or Amend the Final Judgment of the Court challenging the original finding that redevelopment by Mr. Eaton was not feasible in the context of the Phillips–Jackson Street Plan. In addition, they included by way of a Motion to Supplement the Rule 59 Motion with exhibits, several sets of documents in support of their argument that they had a right pursuant to Tennessee Code Annotated 13–20–105 to develop the property themselves. The Eatons argued in their Motion that the amendment to the possession order procured by MDHA is unconstitutional insofar as it seeks retroactive application of the 2001 amendments. They asserted in that Motion that there is, as a result, no valid order of possession in this case. The Eatons sought return of their property that had long since been included in the Row 8.9 development.

MDHA challenged the Motion as an attempt to relitigate the issues heard in the possession hearing and moved to strike the Eatons' Motion to Supplement the record arguing that the Motion was untimely. In its order entered August 16, 2005, the trial court denied the Eatons' Rule 59 Motion and likewise denied MDHA's Motion as moot. The Eatons now appeal.

## IV. ANALYSIS

■ The right of eminent domain is an inherent governmental right. *County Highway Commission of Rutherford County v. Smith,* 61 Tenn.App. 292, 454 S.W.2d 124, 126 (1969). When the govern-

ment determines to exercise this right for the public good, the decision is reviewed only to determine whether the government acted arbitrarily and capriciously in so exercising its eminent domain power. The rule is stated in *City of Knoxville v. Heth,* 186 Tenn. 321, 210 S.W.2d 326 (1948):

Having determined that the proposed taking is for a 'public use', it is the rule that a municipal corporation's determination of necessity in these cases is conclusive upon the courts in the absence of fraudulent, arbitrary, or capricious action by the City. An excerpt from an opinion of this Court has been often quoted in this aspect of the instant case. We again quote and adopt this statement which is: 'But all other incidents of the taking are political questions, for the determination of the sovereign, and not judicial questions, for the determination of the courts. Selecting the property to be taken, as contradistinguished from similar property in the same locality, determining its suitableness for the use to which it is proposed to put it, as well as deciding the quantity required, are all political questions, which inhere in and constitute the chief value of the power to take.' *Southern Ry. Co. v. Memphis,* 126 Tenn. 267, 282, 283, 148 S.W. 662, 41 L.R.A.N.S. 828, Ann.Cas. 1913E, 153; 4 McQuillin, Mun. Corp., 2d Ed.Rev., 473–482; 18 Am.Jur., 733, 734; 1 Lewis, Eminent Domain, 3d Ed.1909, 674–677.

*City of Knoxville v. Heth,* 186 Tenn. 321, 210 S.W.2d 326, 332–33 (1948).

■ As indicated by the Court, the principle question addressed to the judiciary is whether private property is indeed being taken for public use. In this context, we find the following discussion from the Supreme Court, adopting language of the Superior Court of Pennsylvania in *Belov-*

*sky v. Redevelopment Auth.*, 357 Pa. 329, 54 A.2d 277 to be enlightening;

'In the case of the Urban Redevelopment Law the operation of clearing and rehabilitating the 'slums,' now called 'blighted areas', is not to be followed by a continuing ownership of properties by the Redevelopment Authorities for any such further and ulterior social-welfare purpose as that of providing low rental homes for persons in moderate circumstances. In this additional feature of the Housing Authorities Law there was implicit the modern recognition of an enlarged social function of government which called for an advance over previous legal conceptions of what constitutes a public use justifying the exercise of the power of eminent domain, but this court sustained the constitutionality of that act, and the courts of numerous other States have, without exception, upheld similar legislation. In the case of the Urban Redevelopment Law, therefore, the justification of the grant of the power of eminent domain is even clearer than in the case of the Housing Authorities Law, there being in the present act only the one major purpose of the elimination and rehabilitation of the blighted sections of our municipalities, and that purpose certainly falls within any conception of 'public use' for nothing can be more beneficial to the community as a whole than the clearance and reconstruction of those sub-standard areas which are characterized by the evils described in the Urban Redevelopment Law.'

In accord with this decision are a number of other relevant opinions from other jurisdictions. *Cremer, et al. v. Peoria Housing Authority et al.*, 399 Ill. 579, 78 N.E.2d 276; *People ex rel. Tuohy v. City of Chicago et al.*, 399 Ill. 551, 78 N.E.2d 285; *Poole v. City of Kankakee*, 406 Ill. 521, 94 N.E.2d 416; *Opinion to*

*the Governor, R.I.*, [76 R.I. 249,] 69 A.2d 531; *Opinion of the Justices*, 254 Ala. 343, 48 So.2d 757. After the report of the decision in *New York Housing Authority v. Muller*, 270 N.Y. 333, 1 N.E.2d 153, 105 A.L.R. 905, there is a pertinent annotation in 105 A.L.R., commencing at page 911.

*Nashville Housing Authority v. City of Nashville*, 192 Tenn. 103, 237 S.W.2d 946, 950–51 (1951).

■ The preface to the Phillips–Jackson Streets Redevelopment Plan as originally approved states:

This Phillips–Jackson Street Redevelopment Plan is located in Metropolitan Nashville and Davidson County, Tennessee and is undertaken by the Metropolitan Development and Housing Agency, hereinafter referred to as "MDHA", in accordance with and in furtherance of the objectives of Article I, Section 8 and 21, Article II, Section 28, of the Constitution of Tennessee; The Housing Authorities Law, Chapters 20 and 45, Public Acts of Tennessee 1935 (1st Ex. Session, as amended; Chapter 114 of Public Acts of Tennessee of 1945, as amended; Chapter 181 of Public Acts of Tennessee of 1955; said statutes now codified in Sections 13–20–201 through 13–20–216 Tennessee Code Annotated. The Metropolitan Council of Nashville and Davidson County has declared the area to be a blighted area within the scope of Section 13–20–201, Tennessee Code Annotated.

The legislative creation of housing authorities predates the statutory inception of blighted area redevelopment by ten (10) years. *See* Ch. 20 1935 Tenn.Pub.Acts E.S. 209 (Housing Authority Law). *See* Ch. 114 1945 Tenn.Pub.Acts 353 ("An act to declare the necessity of clearing and redeveloping blighted areas ...") The re-

strictions placed on the power of eminent domain present in Tennessee Code Annotated section 13–20–105 do not appear in the statutes until 1972, some 27 years after the original act establishing the blighted area redevelopment powers. Nevertheless, the State argues that the adoption of an urban *redevelopment* plan pursuant to Tennessee Code Annotated sections 13–20–201 through 13–20–209 is not subject to the rights listed in Tennessee Code Annotated section 13–20–105. The Eatons argue that such section gives them, as individual owners subject to an urban redevelopment project, the power to individually develop their land.

It bears noting that by its terms, Tennessee Code Annotated section 13–20–105 restricts MDHA's power with respect to private property in an "urban renewal area." The statute further provides that an individual developer as described in the section must abide by an "urban renewal plan." As used in Tennessee Code Annotated 13–20–105 "urban renewal area" is not specifically defined in our statutes. However, the phrase urban renewal project is specifically described in Tennessee Code Annotated 13–20–210 and 211. Section 210 provides in pertinent part:

**13–20–210. Urban renewal projects— Extent of rehabilitation.**—In addition to its authority under any other section of this part, an authority is hereby authorized to plan and undertake urban renewal projects. As used in this part, an urban renewal project may include undertakings and activities for the elimination (and for the prevention of the development or spread) of slums or blighted, deteriorated, or deteriorating areas, and may involve any work or undertaking for such purpose constituting *a redevelopment project* of any rehabilitation or conservation work, or any combination of such undertaking or work.

Tenn.Code Ann. § 13–20–210. (emphasis added)

Section 211 further describes an urban renewal plan:

**13–20–211. Urban renewal plan.**—(a) Any urban renewal project undertaken pursuant to § 13–20–210 shall be undertaken in accordance with an urban renewal plan for the area of the project. As used in this part, "urban renewal plan" means a plan, as it exists from time to time, for an urban renewal project, which plan: (1) Shall conform to the general plan for the municipality as a whole; and (2) Shall be sufficiently complete to indicate such land acquisition, demolition and removal of structures, redevelopment, improvements, and rehabilitation as may be proposed to be carried out in the area of the urban renewal project, zoning and planning changes, if any, land uses, maximum densities, building requirements, and the plan's relationship to definite local objectives respecting appropriate land uses, improved traffic, public transportation, public utilities, recreational and community facilities, and other public improvements.

(b) An urban renewal plan shall be prepared and approved pursuant to the same procedure as provided in this part with respect to a redevelopment plan. [Acts 1955, ch. 181 § 1; T.C.A., § 13–823.]

Tenn.Code Ann. § 13–20–211.

The language of a statute is not interpreted in a vacuum. Legislators are presumed to know the state of the law at the time that they undertake new enactments. *See e.g., Hodges v. S.C.Toof and Co.,* 833 S.W.2d 896, 899 (Tenn.1992); *Lavin v. Jordon,* 16 S.W.3d 362, 368 (Tenn.2000). Further, "[T]he most basic principle of statutory construction is to ascertain and give

effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Worley v. Weigels, Inc.,* 919 S.W.2d 589, 593 (Tenn.1996); *see also Saturn Corp. v. Ruth Johnson, Commissioner of Revenue, State of Tennessee,* 197 S.W.3d 273, (Tenn. Ct.App., April 18, 2006)(*no perm. app. filed*). While it is argued on the State's behalf that the plain language of the statute contemplates application only to urban renewal plans, consideration of the entirety of Title 13, Chapter 20, parts 1 and 2 dictate a contrary conclusion. To assume otherwise renders Tennessee Code Annotated 13–20–210 meaningless.

■ The difficulty confronting the Eatons is that Tennessee Code Annotated 13–20–105 involves exceptions to the power of the condemning authority to take private property for a public purpose. Eaton does not deny the existence of the public purpose and indeed concedes that the area in which his property is located is a "blighted" area within the meaning of Tennessee Code Annotated 13–20–201. The power of eminent domain in the housing authority had been granted in Chapter 20 of the Public Acts of 1935 (ES) as to housing projects. The power of eminent domain as to redevelopment projects was encompassed in Chapter 114 of the Public Acts of 1945 supplemented by Chapter 181 of the Public Acts of 1955, now codified as Tennessee Code Annotated section 13–20–212. In 1972, the General Assembly carved out the exception as to the power of eminent domain, which is now codified as Tennessee Code Annotated section 13–20–105. The three prerequisites necessary to bring a landowner's property within this statutory exception to the power of eminent domain are conjunctive, not disjunctive, and all three conditions must be satisfied before the exception is applicable. The three elements are: "if the owner of same desires to develop such owner's own property, *and* the designated reuse of the property in the urban renewal plan is such that the owner's parcel can be redeveloped by itself without affecting the objectives of the urban renewal plan as to the owner's parcel or adjoining or adjacent properties thereto, *and* the owner signs an agreement with the housing authority to abide by the urban renewal plan, in any development thereof." (emphasis added) Tenn.Code Ann. § 13–20–105.

As the Supreme Court of Tennessee has stated:

> Provisos of the kind here in question must be strictly construed.
>
> "This is true because the legislative purpose set forth in the general enactment expresses the legislative policy and only those subjects expressly exempted by the proviso should be freed from the operation of the statute." Sutherland Statutory Construction, 3rd Edition, Horack, Vol. 2, Sec. 4933; *Trice v. McGill,* 158 Tenn. 394, 398, 13 S.W.2d 49; *Powers v. Vinsant,* 165 Tenn. 390, 393, 54 S.W.2d 938.

*State, ex rel. Cope v. Davidson County,* 198 Tenn. 24, 277 S.W.2d 396, 400 (1955).

■ As explained by the Supreme Court, "It is almost a maxim in the interpretation of statutes, that an exception to a general statute is strictly construed and takes no case out of the general statute which does not fall fully within the terms of the exception. Lewis' Sutherland, Statutory Construction, § 352." *Trice v. McGill,* 158 Tenn. 394, 13 S.W.2d 49, 50 (1929). *See also Teague v. Campbell County,* 920 S.W.2d 219, 221 (Tenn.Ct.App. 1995).

■ Those who claim the benefit of an exception under a statute have the burden of proving that they come within the limited class for whose benefit it was

established. *Conservation Commissioner of Simsbury v. Price*, 193 Conn. 414, 479 A.2d 187 (1984). This is especially true when the enacting clause contains no such exception and same appears in a subsequent provision or in another statute. *Baca v. Bueno Foods*, 108 N.M. 98, 766 P.2d 1332, 1336–37 (Ct.App.1988). *See also* Annotation "Burden of Allegation and Proof in Civil Cases as Regards Exception in Statute", 130 ALR 440 (1941). Statutory restrictions which provide exceptions following a general grant of power are likewise strictly construed. *U.S. ex rel Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir.1991). As explained by the Supreme Court of New Mexico, "when an exception is included and forms a necessary part of the enacting clause of a statute, the party relying thereon must negative the exception; but, where an exception appears in a subsequent section or division, or appears in another statute, it is unnecessary to do so, such being matters of defense to be raised by the opposite party. Authorities supporting this rule are assembled in the annotations in 130 ALR 440, *et seq.*" *Whitfield v. City Bus Lines*, 51 N.M. 434, 187 P.2d 947, 950 (1947).

The power of eminent domain as granted to housing authorities under Chapter 20, Section 11 of the Public Acts of 1935 (E.S.) was unconditional. The provision appearing in prior codification as part of Tennessee Code Annotated 13–804, "to acquire by eminent domain any property, real or personal improvements and fixtures thereon", was not modified to reflect the enactment of Chapter 711 of the Public Acts of 1972 (codified as Tennessee Code Annotated 13–20–105) until the 1980 replacement volume 3A of Tennessee Code Annotated was issued. The provision appearing therein as Tennessee Code Annotated section 13–20–104(16) provides, "To acquire by eminent domain any real property, including improvements and fixtures thereon except as provided in Section 13–20–105." This same provision now appears in the 1999 replacement volume 3B of Tennessee Code Annotated as section 13–20–104(a)(17).

■ In their response to the condemnation petition filed May 21, 2001, the Eatons raised the issue of their desire to develop the property themselves, relying on Tennessee Code Annotated 13–20–105. At the possession hearing of May 24, 2001, little proof was offered by the Eatons beyond an abstract desire to develop their own property.

The testimony of MDHA witness Joseph Cain is essentially undisputed:

Q Prior to the enactment of the plan, did MDHA make a determination that areas within the redevelopment area were blighted?

A We do a survey of all parcels within the boundary area, as a whole is determined to be blighted. I do not know the exact percentage of exact parcels that were determined blighted, but a large percentage of property in the area are determined blighted, which we make our findings available to the counsel and that goes towards the counsel's determination that the whole area is blighted.

Q And that was the finding in this case by MDHA after the survey that the area was blighted?

A Correct.

Q And then that finding was adopted by the Metro Council with the enactment of the plan?

A That's correct.

Q Why was the Eaton property designated for acquisition in the Phillips Jackson Plan?

A That block right there consists of quite a bit of vacant property. It's a fairly strategic piece of property. It's a fairly strategic piece of property. It's on 8th Avenue. It has good visibility. That property is directly across the street from what was the proposed Bicentennial Mall and it's become the Farmers Market. And since it was essentially vacant property, we thought that that would be a good sight for redevelopment and that the property would, due to the diversity of ownership, need to be assembled together. And the whole block was put into acquisition.

Q What do you mean by the diversity of the ownership?

A Approximately—the portion that we are currently acquiring for the proposed project, which involves Mr. Eaton's property, there are, I believe, seven different property owners. Quite a few of those parcels are small, as small as 30 feet in street frontage, and it's nearly impossible to assemble property together without the authority that the housing authority has to acquire by eminent domain.

Q What is presently located—you can help me with the directions—to the rear of the Eaton property?

A The property that fronts on 9th, Mr. Eaton has what appears to be just inoperable vehicles in there. I don't believe those are vehicles that are for sale.

Q And what's located across the street from the rear?

A That is the Hope Gardens neighborhood, which MDHA in 1996 received a grant from Tennessee Housing Development of $21 million to revitalize that entire neighborhood. We have constructed approximately 50 new homes back in that area. It was an area—over half of that property was vacant at the time, and we were in a major push to revitalize the construction of new homes in the area and bring the people back into that neighborhood.

Q I understand that the plan contemplates mixed uses. Is that correct?

A The redevelopment plan does.

Q What is the current use of Mr. Eaton's property?

A Mr. Eaton's current use is automotive sales. The Phillips Jackson Redevelopment Plan does not allow automotive sales in the plan.

. . .

Q Is it practical for the Eaton's to retain ownership of their property and develop it themselves?

A Mr. Eaton's property is a small—is a small piece of property. It's less than half an acre. I believe it's in the neighborhood of about 1,700 or 1,800 square feet. The practicality of developing that in and of itself is—while I feel it is physically possible, the practicality of it is probably not very feasible. The Hope Gardens Plan that was adopted, includes on the rear portion of that property, Mr. Eaton's property, residential uses. And so for any type of commercial reuse of that property on the frontage, essentially the property—the size of the property would be cut in half as to how much commercial use he would have, and most likely be reused dictate a—almost dictating a full buffer zone between frontage and 9th. And so it limits the potential for development even greater.

Q Do you have an illustration with you today that shows the Hope Gardens Design Plan that you just referenced in you testimony?

A I don't know if I made—I believe I handed you a copy of that. I don't know if I made one.

Q  We can move on.  Why can't Mr. Eaton simply hold onto—Mr. and Mrs. Eaton hold on to their property and develop it for residential uses?

A  We had designated that property for acquisition in 1993.  We have acquired the majority of those properties in the area designated for acquisition.  The majority of them have been acquired.  It is the matter of our plan just moving on through.  We don't always acquire every piece of property that's designated for acquisition. however, the time seems to be correct for development of that.  The developer, like I said, approached MDHA to develop it as residential.  It met with the plans of Hope Gardens Plan. It also met with the plan of Phillips Jackson, and that was the overall plan of the city.

Q  Is there a disadvantage to allowing these small tracks located within the project to be developed by individual land owners?

A  You would lose continuity of the development.  In addition, you would los[e] cost efficiency.  It would be much more efficient to develop 30 simultaneously than it would be to develop one unit at a time.

In its findings, following the May 24, 2001 hearing, which findings are part of the trial court's order of June 25, 2001, the trial court states:

14.  The Eaton property will be assembled with several other small tracts and sold to a private developer that will construct the thirty (30) residential condominium units with amenities and common areas of Row 8.9.

15.  One of the 'redevelopment plan objectives' of the Phillips–Jackson Street Plan is to provide for the redevelopment of the land within the plan area '. . . wherein non-conforming or deleterious land uses and the present subdivision and ownership of the land precludes the orderly assemblage and desired changes in the use of the land.'

16.  If the Eatons were permitted to develop the Eaton property in isolation, MDHA would lose the continuity of the development and cost efficiency in redevelopment that comes from the assemblage of small parcels which would frustrate the objectives of the Phillips–Jackson Street Plan.

No proof is offered by the Eatons that would satisfy the second element of the Tennessee Code Annotated 13–20–105 exception to the power of eminent domain. The trial court has specifically found on the evidence offered at the May 24, 2001 hearing that such individual development by the Eatons would frustrate the objectives of the urban renewal plan.  The Eatons thus cannot bring themselves within the exception to eminent domain provided by Tennessee Code Annotated 13–20–105, and the trial court did not err in granting possession to MDHA following the possessory hearing of May 24, 2001.

Following the June 25, 2001 order granting possession of the property to MDHA, the Eatons sought an extraordinary appeal under Tennessee Rule of Appellate Procedure Rule 10, which application was denied by this Court on August 20, 2001.

At this point, MDHA and Metropolitan Government embarked upon what may be figuratively characterized as an elaborate legislative and administrative cavalry charge up an unoccupied hill.  Clearly, MDHA sought by such activities to affirmatively disqualify the Eatons from being able to bring themselves within the ambit of Tennessee Code Annotated 13–20–105. In view of our holding that the applicability of Tennessee Code Annotated 13–20–105 was negated under the facts of this

case and that the trial court's order of June 25, 2001 effectively divested the Eatons of the property subject only to an adjudication of damages, we will not delve into the intricacies of these maneuverings. It will suffice to observe that the soothing assurances given us at the bar of this Court that such activities were actually meaningless, sharply conflict with the position of MDHA before the trial court.

We come now to the procedural posture of this case before the Court. Almost four (4) years elapsed between the May 24, 2001 possessory hearing before the trial court and the May 2005 jury trial determining compensation to be awarded to the Eatons for the taking of their property. Following that hearing, the Eatons on June 17, 2005, filed a Motion to Alter or Amend the trial court's order of possession of June 25, 2001 as amended by its supplemental possession order entered in December of 2001.

The June 17, 2005 Motion to Alter or Amend filed pursuant to Tennessee Rules of Civil Procedure 59.02 and 59.04 attacks the proceedings occurring subsequent to June 25, 2001 and reasserts the applicability of Tennessee Code Annotated 13–20–105. The trial court denied the Motion to Alter or Amend by order entered August 16, 2005, and the Eatons perfected their appeal challenging the trial court's original possession order, the amended possession order and the order denying their Motion to Alter or Amend. The Eatons, do not press on appeal any objection to the amount of compensation awarded by the jury for the taking of their property. On appeal, the action of the trial court in ruling on a motion under Tennessee Rule of Civil Procedure 59 to Alter or Amend is reviewed under an abuse of discretion standard. *Kenyon v. Handal,* 122 S.W.3d 743, 765–66 (Tenn.Ct.App.2003); *Stovall v. Clarke,* 113 S.W.3d 715, 721 (Tenn.2003).

Since the Tennessee Rule of Civil Procedure Rule 59 Motion filed four (4) years subsequent to the June 25, 2001 Order of Possession simply sought to relitigate matters that had already been adjudicated, the trial court did not abuse its discretion in overruling the Motion. *Vaccarella v. Vaccarella,* 49 S.W.3d 307, 312 (Tenn.Ct.App. 2001).

The judgment of the trial court is in all respects affirmed. The case is remanded to the trial court for such further proceedings as may be necessary and proper. Costs of the cause are assessed against Appellants.