Belovsky, Appellant, *v.* Redevelopment Authority of Philadelphia et al.

Argued April 16, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Irving W. Backman* and *Edmund Backman,* for plaintiff, appellant.

*Abraham Wernick,* Assistant City Solicitor, with him *G. Coe Farrier,* Assistant City Solicitor and *Frank F. Truscott,* City Solicitor, for City of Philadelphia et al., appellees.

*Abraham L. Freedman,* with him *Howard E. Stern,* for Redevelopment Authority of Philadelphia, appellee.

*Ralph B. Umsted,* Deputy Attorney General and *T. McKeen Chidsey,* Attorney General, for Commonwealth, intervenor.

*Anne X. Alpern,* City Solicitor, for City of Pittsburgh, intervening appellee.

*William H. Eckert,* for Pittsburgh Redevelopment Authority, appellee.

*Oscar G. Bender,* filed a brief for North Philadelphia Realty Board and West Philadelphia Realty Board, amici curiæ.

*Henry C. Beerits* filed a brief for Burholme Improvement Association et al., amici curiæ.

OPINION BY MR. JUSTICE HORACE STERN, July 29, 1947:

Plaintiff's bill in equity, filed by her as a taxpayer of the City of Philadelphia challenges the constitutionality of the "Urban Redevelopment Law" of May 24, 1945, P. L. 991, the "Redevelopment Cooperation Law" of May 24, 1945, P. L. 982, and the Act of May 24, 1945, P. L. 977, which amended the Act of May 17, 1921, P. L. 682, by authorizing life insurance companies to invest in city housing projects in redevelopment areas. The bill seeks an injunction to prevent the Redevelopment Authority of the City of Philadelphia from entering upon any activities pursuant to these statutes, and the City of Philadelphia and its officers from appropriating any public moneys to the Authority and from entering into any agreement with it. The Commonwealth of Pennsylvania has intervened in the litigation as have also the City of Pittsburgh and a great number of civic, philanthropic, social and business organizations of the City of Philadelphia. The learned court below dismissed the bill.

The Urban Redevelopment Law determines and declares as a matter of legislative finding—(a) "That there exist in urban communities in this Commonwealth areas which have become blighted because of the unsafe, unsanitary, inadequate or overcrowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, or economically or socially undesirable land uses. (b) That such conditions or a combination of some or all of them have and will continue to result in making such areas economic or social liabilities, harmful to the social and economic well-being of the entire communities in which they exist, depreciating values therein, reducing tax revenues, and thereby depreciating further the general community-wide values. (c) That the foregoing

conditions are beyond remedy or control by regulatory processes and cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted, and that such conditions exist chiefly in areas which are so sub-divided into small parcels and in divided ownerships that their assembly for purposes of clearance, replanning and redevelopment is difficult and impossible without the effective public power of eminent domain. (d) That the acquisition and sound replanning and redevelopment of such areas in accordance with sound and approved plans for their redevelopment will promote the public health, safety, convenience and welfare." Therefore the act declares it to be "the policy of the Commonwealth of Pennsylvania to promote the health, safety and welfare of the inhabitants thereof by the creation of bodies corporate and politic to be known as Redevelopment Authorities, which shall exist and operate for the public purposes of acquiring and replanning such areas and of holding or disposing of them in such manner that they shall become available for economically and socially sound redevelopment. Such purposes are hereby declared to be public uses for which public money may be spent, and private property may be acquired by the exercise of the power of eminent domain."

Although such legislative declarations are subject to judicial review they are entitled to a prima facie acceptance of their correctness: *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 222, 200 A. 834, 841.

The act creates for each city and county of the Commonwealth a so-called "Redevelopment Authority", which is not in any way to be deemed to be an instrumentality of the city or county or engaged in the performance of a municipal function. No Authority shall transact business or otherwise become operative until the governing body[1] of the city or county shall find and

1 "Governing Body" is defined as being "In the case of a city, the city council or other legislative body thereof, and in the case of

declare that there is need for it to function; upon such declaration being made the mayor or the board of county commissioners, as the case may be, shall appoint the members of the Authority. An Authority "shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof", and shall have all the powers necessary or appropriate to effectuate the purposes and provisions of the act,—among them the power to acquire property whether by purchase, gift or eminent domain; to own, hold, improve and manage such property; to sell, lease or otherwise transfer, subject to approval by the local governing body, any development area, either as an entirety to a single redeveloper[2] or in parts to several redevelopers; and to borrow from private lenders or from the State or Federal Government funds necessary for its operation and work.

The scheme of redevelopment[3] proceeds under the act as follows:—The local planning commission makes a "redevelopment area plan" designating an area which it finds to be blighted because of the existence of the conditions enumerated in the act and containing recommendations for the redevelopment of such area. The plan must set forth the boundaries of the area, information concerning its buildings and population, a statement of the existing uses of the real property therein, a statement of the proposed uses following redevelopment, a statement of the proposed changes in zoning

a county, the board of county commissioners or other legislative body thereof."

[2] "Redeveloper" is defined as "Any individual, partnership or public or private corporation that shall enter or propose to enter into a contract with an Authority for the redevelopment of an area under the provisions of this act."

[3] "Redevelopment" is defined as "The acquisition, replanning, clearance, rehabilitation or rebuilding of an area for residential, recreational, commercial, industrial or other purposes, including the provision of streets, parks, recreational areas and other open spaces."

ordinances and street layouts, an estimate of the cost of acquisition of the area and other costs necessary to prepare it for redevelopment, and a statement of such continuing controls as may be deemed necessary to accomplish the purposes of the act. Thereupon the Authority prepares a "redevelopment proposal" for the redevelopment of all or part of such area, including the proposed redevelopment contract and the selection of the redeveloper, and submits this proposal to the planning commission for review. The proposal, together with the planning commission's recommendations thereon, are then certified to the governing body, which, after a public hearing, approves or rejects the proposal and the redevelopment contract; in the event of the proposal being approved the Authority is empowered to execute the contract and to take such action as may be necessary to carry it out. The contract provides for the amount of the consideration to be paid by the redeveloper to the Authority and for the necessary continuing controls. Any deed or lease to a redeveloper in furtherance of the contract must contain such provisions as the Authority may deem desirable to run with the land in order to effectuate the purposes of the act. The Authority is granted the right of eminent domain and title to any property thus acquired shall be an absolute or fee simple title unless a lesser title shall be designated in the eminent domain proceedings. The Authority may issue bonds for any of its corporate purposes, the principal and interest of which are payable from its revenues generally; such bonds may be secured by a pledge of any of its revenues or by a mortgage of any of its property; the bonds and the income therefrom shall at all times be free from taxation for State or local purposes. Neither the bonds nor any other obligations of the Authority shall be a debt of any municipality [4] or of the

---

[4] "Municipality" is defined as "Any county, city, borough or township."

Commonwealth, nor shall any municipality or the Commonwealth nor any revenues or any property of any municipality or of the Commonwealth be liable therefor.

The "Redevelopment Cooperation Law" provides that the city council or the county commissioners, as the case may be, may make such appropriations to an Authority as are deemed necessary to assist the Authority in carrying out its public purposes. Any State public body [5] located in whole or in part within the field of operation of a Redevelopment Authority is granted the power from time to time to lend or donate money to the Authority.

Legislation similar to these Pennsylvania statutes has been adopted in 23 other States.

Pursuant to the authority given in the Urban Redevelopment Law the Council of the City of Phladelphia enacted an ordinance, on September 21, 1945, which stated that there existed in the city areas which had become blighted by reason of the conditions described in the Urban Redevelopment Law; the council therefore found and declared that there was need for a Redevelopment Authority to function within the city. Accordingly such an Authority was organized and subsequently the council made an appropriation to it for administrative expenses during the year 1946 and at the time of the hearing of this case in the court below had under consideration the making of another appropriation for the year 1947. A Redevelopment Authority has been similarly created and organized in and for the City of Pittsburgh.

The present attack upon the constitutionality of the Urban Redevelopment Law centers largely upon the grant therein made to the Redevelopment Authorities of the power to exercise the right of eminent domain. It is contended that the taking of property under the act is not for a public purpose and therefore cannot constitu-

---

[5] "State Public Body" is defined as "Any city, borough, town, township, county, municipal corporation, other subdivision, board, commission, housing authority or public body of this Commonwealth."

tionally be effected by resort to the power of eminent domain.

*Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 200 A. 834, may be regarded as the prototype of the present case since all the arguments now presented on this subject were there fully considered. The Urban Redevelopment Law closely parallels the provisions of the "Housing Authorities Law" of May 28, 1937, P. L. 955, with which the *Dornan* case was concerned. The fundamental purpose of both these acts was the same, namely, the clearance of slum areas, although the Housing Authorities Law aimed more particularly at the elimination of undesirable dwelling houses whereas the Urban Redevelopment Law is not so restricted. But the Housing Authorities Law had an important additional objective in that, as ancillary to the slum clearances, there were to be provided "decent, safe, and sanitary urban or rural dwellings, apartments or other living accommodations for persons of low income"; these were to be constructed and acquired by the Housing Authorities and leased out by them to the class of tenants for whose use such accommodations were designed. In the case of the Urban Redevelopment Law the operation of clearing and rehabilitating the "slums", now called "blighted areas", is not to be followed by a continuing ownership of properties by the Redevelopment Authorities for any such further and ulterior social-welfare purpose as that of providing low rental homes for persons in moderate circumstances. In this additional feature of the Housing Authorities Law there was implicit the modern recognition of an enlarged social function of government which called for an advance over previous legal conceptions of what constitutes a public use justifying the exercise of the power of eminent domain, but this court sustained the constitutionality of that act, and the courts of numerous other States have, without exception, upheld similar legislation. In the case of the Urban Redevelopment Law, therefore, the

justification of the grant of the power of eminent domain is even clearer than in the case of the Housing Authorities Law, there being in the present act only the one major purpose of the elimination and rehabilitation of the blighted sections of our municipalities, and that purpose certainly falls within *any* conception of "public use" for nothing can be more beneficial to the community as a whole than the clearance and reconstruction of those sub-standard areas which are characterized by the evils described in the Urban Redevelopment Law. It has long been clear that those evils cannot be eradicated merely by such measures, however admirable in themselves, as tenement-house laws, zoning laws and building codes and regulations; these deal only with future construction, not with presently existing conditions. Nor, as experience has shown, is private enterprise adequate for the purpose. The legislature has therefore concluded—and the wisdom of its conclusion is for it alone—that public aid must accompany private initiative if the desired results are to be obtained. The great cities of Europe have been improved and largely rebuilt through the expenditure of public moneys by the edicts of monarchs and dictators; if the governing bodies in our own democratic Commonwealth are to be held unable, under our constitution, to plan and support such reconstruction projects, our cities must continue to be marred by areas which are focal centers of disease, constitute pernicious environments for the young, and, while contributing little to the tax income of the municipality, consume an excessive proportion of its revenues because of the extra services required for police, fire and other forms of protection.

One of the objections urged against the constitutionality of the Urban Redevelopment Act is the feature of the "redevelopment project" [6] which contemplates the

---

[6] "Redevelopment Project" is defined as "A project undertaken by a redeveloper under a contract with an Authority in accordance with the provisions of this act."

sale by the Authority of the property involved in the redevelopment, it being claimed that thereby the final result of the operation is to take property from one or more individuals and give it to another or others. Nothing, of course, is better settled than that property cannot be taken by government without the owner's consent for the mere purpose of devoting it to the private use of another, even though there be involved in the transaction an incidental benefit to the public. But plaintiff misconceives the nature and extent of the public purpose which is the object of this legislation. That purpose, as before pointed out, is not one requiring a continuing ownership of the property as it is in the case of the Housing Authorities Law in order to carry out the full purpose of that act, but is directed solely to the clearance, reconstruction and rehabilitation of the blighted area, and after that is accomplished the public purpose is completely realized. When, therefore, the need for public ownership has terminated, it is proper that the land be re-transferred to private ownership, subject only to such restrictions and controls as are necessary to effectuate the purposes of the act. It is not the object of the statute to transfer property from one individual to another; such transfers, so far as they may actually occur, are purely incidental to the accomplishment of the real or fundamental purpose. However, it is of passing interest to note that there are some cases in which the constitutionality of statutes was sustained the very object of which was to effect such transfers of ownership. Thus in *State of Washington v. Clausen,* 110 Wash. 525, 188 P. 538, it was held to be a valid public purpose for the State to purchase and improve tracts of undeveloped agricultural lands and subdivide and dispose of them to individual farmers and settlers. And in *People of Puerto Rico v. Eastern Sugar Associates,* 156 F. 2d 316 (cert. den. 67 S. Ct. 190), it was held that the prohibition against taking property without due process of law was not violated by an act

which, in order to establish a scheme of agrarian reform, authorized the condemnation of land by a Land Authority for the sole purpose of subdividing and disposing of it to individuals for homesteads and farms. True, it was held in *Pennsylvania Mutual Life Insurance Co. v. Philadelphia,* 242 Pa. 47, 88 A. 904, that an act was unconstitutional which authorized cities to acquire properties adjoining a parkway and then resell them subject to building restrictions, but this was because the only purpose was to beautify the parkway and aesthetic objectives are not sufficient to justify the exercise of the power of eminent domain. In the Housing Authorities Law the Authorities were given the power to sell, exchange, transfer or assign any property to any person, firm or corporation, public or private, when the Authority determined that such property was not needed for the purposes of the act, and we sustained the validity of that provision: *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 227, 228, 200 A. 834, 843. Indeed, so far from it being legally objectionable that property acquired by eminent domain be resold or retransferred to private individuals after the purpose of the taking is accomplished, the law actually requires that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised (*Bachner v. Pittsburgh,* 339 Pa. 535, 539, 15 A. 2d 363, 365) and upon cessation of the public use the public ownership is properly discontinued. Nor does the taking lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefited.

As is not unusual when the constitutionality of an important statute is assailed, attacks are here made upon alleged violations of a considerable number of constitutional provisions, possibly in the hope that a stray shot may find its way to some vital target. One of these assaults is directed against an alleged delegation of

legislative powers contrary to the provision of Article II, section 1 of the Constitution, it being claimed that insufficient standards are set up in the statute to guide the Authority in exercising the powers with which it is vested. The fact is, however, that the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express; in regard to such factors as the selection and the size of the areas to be redeveloped, the costs involved, and the exact form which the redevelopment in any particular case is to take, it was obviously impossible for the legislature to make detailed provisions or blueprints in advance for each operation. It is to be borne in mind that all the powers given to the Authority in regard to the making of the redevelopment proposal, including the redevelopment contract and the selection of the redeveloper, are subject to the approval of the city council or the county commissioners, and only after all the details of the particular project are formulated is the ultimate decision made by those governing bodies as to whether the proposed redevelopment is to be carried into effect. The planning necessary to accomplish the purposes of the act must necessarily vary from place to place within the same city or county and from city to city and county to county. All that the legislature could do, therefore, was to prescribe general rules and reasonably definite standards, leaving to the local authorities the preparation of the plans and specifications best adapted to accomplish in each instance the desired result, a function which obviously can be performed only by administrative bodies. While the legislature cannot delegate the power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act. So far as Article II, section 1 of the Constitution is concerned the validity of the

Urban Redevelopment Law finds support in many authorities: *Kelley v. Earle,* 325 Pa. 337, 352, 353, 190 A. 140, 147; *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 229, 230, 200 A. 834, 844; *Williams v. Samuel,* 332 Pa. 265, 273, 274, 2 A. 2d 834, 838; *Chester County Institution District v. Commonwealth,* 341 Pa. 49, 61-64, 17 A. 2d 212, 218, 219; *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 229, 230, 200 A. 834, 844.

The act does not violate Article III, section 3 of the Constitution because of any deficiency in its title. The title is virtually a complete index of the provisions of the statute. Although, as plaintiff points out, there is no mention of the fact that the properties acquired by the Authority may be resold to private individuals after the redevelopment has been accomplished, the title does state that the Authorities have the power of the leasing and selling of property, and also that they may contract with private redevelopers.

The act does not offend the provision of Article III, section 20 of the Constitution that the legislature shall not delegate to any special commission or private corporation any power to make, supervise or interfere with any municipal improvement or perform any municipal function. The redevelopment Authorities are purely administrative bodies enjoying no important power which is not subject to the approval of the city council or the county commissioners; the Authorities cannot independently exercise any municipal functions. Moreover they are public bodies and not special commissions or private corporations within the meaning of the constitutional prohibition: *Tranter v. Allegheny County Authority,* 316 Pa. 65, 77-79, 173 A. 289, 294, 295; *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 230, 200 A. 834, 844; *Williams v. Samuel,* 332 Pa. 265, 274, 2 A. 2d 834, 838, 839.

There is no violation of Article IX, sections 1 and 3 of the Constitution which provide that all taxes shall be uniform and that only certain prescribed property

may be exempted from taxation. The provision of the Redevelopment Cooperation Law that any city, borough, town, township or county may contract with a Redevelopment Authority with respect to any sums which the Authority may agree to pay for special improvements, services and facilities to be provided by such city, borough, town, township or county for the benefit of the redevelopment, does not, either expressly or impliedly, have any bearing on, or relation to, the subject of tax exemption of property within the redevelopment area. The only tax exemption is that provided by the Urban Redevelopment Law in the case of the bonds issued by an Authority, and it has been held that bonds issued by such a governmental instrumentality are not the kind of property contemplated by the constitutional prohibition against exemption of any property from taxation other than that specified in the Constitution: *Kelley v. Earle,* 325 Pa. 337, 356, 190 A. 140, 149; *Williams v. Samuel,* 332 Pa. 265, 274, 275, 2 A. 2d 834, 839.

The provisions of Article IX, section 8 and Article XV, section 2 of the Constitution concerning the debts of counties, cities and other municipalities and incorporated districts, and the incurring of liability by any municipal commission, are not violated by the Urban Redevelopment Law. A Redevelopment Authority is not a municipal commission. It is specifically provided by the act that neither the bonds nor any other obligations of an Authority shall be debts or liabilities of any municipality or of the Commonwealth. "In view of that declaration", as was said in *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 231, 200 A. 834, 845, "it is difficult to understand how the act in any way impinges upon these constitutional provisions."

In the provision of the Redevelopment Cooperation Law authorizing loans or donations of money to Redevelopment Authorities there is no violation of Article IX, section 7 of the Constitution forbidding the legislature to authorize any county, city, borough, township

or incorporated district to appropriate money for, or to loan its credit to, any corporation, institution or individual. This section of the Constitution has no application to a public corporation such as an Urban Redevelopment Authority, but is restricted to the appropriation of public funds to a purely private enterprise: *Downing v. Erie School District,* 297 Pa. 474, 480, 147 A. 239, 240; *Wentz v. Philadelphia,* 301 Pa. 261, 274, 275, 151 A. 883, 888, 889; *Tranter v. Allegheny County Authority,* 316 Pa. 65, 80, 81, 173 A. 289, 296; *Williams v. Samuel,* 332 Pa. 265, 275, 2 A. 2d 834, 839.

We find, therefore, no merit in any of plaintiff's attacks upon the constitutionality of either the Urban Redevelopment Law or the Redevelopment Cooperation Law. As far as the Act of May 24, 1945, P. L. 977 is concerned, no objections have been advanced to the validity of that statute, and we can see no reason, from a legal or constitutional standpoint, why the Commonwealth cannot validly authorize life insurance companies to invest in city housing projects in redevelopment areas, either through stock ownership or real estate acquisition, subject to the regulations and restrictions provided in the act.

Decree dismissing the bill affirmed; the parties to bear their respective costs.

---

Dissenting Opinion by Mr. Justice Patterson:

The majority opinion holds that it is not an unconstitutional delegation of legislative power to the planning commission, the redevelopment authority, and the governing body to permit them to determine not merely the existence of facts without which the authority could not act but also what constitutes those facts.

What constitutes a blighted area is not specifically defined by the Act. The term "Redevelopment Area" is referred to as, "Any area, whether inproved or unimproved, which a planning commission may find to be blighted because of the existence of the conditions

enumerated in section two of this act so as to require development under the provisions of this act." The only criteria by which the existence of a blighted area is to be ascertained are, therefore, found in section 2 of the Act, to wit: ". . . unsafe, unsanitary, inadequate or overcrowded condition of the dwellings . . . or because of inadequate planning of the area, *or excessive land coverage* by the buildings thereon, or the lack of proper light and air and open space, or . . . *defective design and arrangement of the buildings thereon, or faulty street or lot layout, or economically or socially undesirable land uses.*" (Italics supplied.) The term "Redevelopment" is defined as, "The acquisition, replanning, clearance, rehabilitation or rebuilding of an area for residential, recreational, commercial, industrial or other purposes, including the provision of streets, parks, recreational areas and other open spaces."

The delegated power under the act is so broad that *each planning commission, authority or governing body has been vested with absolute power to determine what facts shall constitute any of the foregoing elements.* The sole restrictions upon exercise of this power exist by virtue of the direction that "The governing body shall not approve a redevelopment proposal unless it is satisfied that adequate provisions will be made to rehouse displaced families, if any, without undue hardship, or, if the municipality in which the project is to be located has filed its objections thereto."

It is the delegation of power to determine the standards in ascertaining the existence of a blighted area which is unconstitutional; not the delegation of power to act when once the jurisdictional facts are found to exist. The constitutional prohibition against delegation of power is not answered by the statement in the majority opinion that "the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express." There is nothing in the act which delimits the sphere of discretion which may be

exercised by the planning commission, governing body, or authority in determining the existence of a blighted area. "Delegation to a fact-finding body of the power to do something that is in itself circumscribed, after facts are found, is not the delegation of a legislative function. But where the delegation to a fact-finding body empowers it to create the conditions which constitute the fact, this is legislative": *Wilson v. Philadelphia School District,* 328 Pa. 225, 237, 195 A. 90. In that case the legislature left to the school board the power to determine what was the necessary amount to be raised and permitted the board to fix the tax rate accordingly. Justice KEPHART, speaking for this Court, said (p. 237) : "Here the determinative fact, the most material element entering into the tax, may be created without restraint by the Board of Education. This determination can be nothing else than legislative."

Whether power to determine what the law shall be has been delegated must be determined by consideration of the scope of the power given, as well as the manner in which it may be exercised. Conceivably, a determination of a blighted area may be reasonable and just under all the circumstances of a given case. It is equally possible and probable that such finding may be arbitrary, capricious and unreasonable. Cf. *Schechter v. United States,* 295 U. S. 495, 532. Pursuant to the powers given, the authority, in conjunction with the planning commission and governing body, may successfully condemn all property within the territorial limits of a city. Such condemnation could not be successfully challenged if the jurisdictional fact is found that the present use of the land is "socially undesirable." Social undesirability has not been defined by the legislature and can be determined solely by the planning commission, authority, and governing body. Having thus condemned the property, the authority may redevelop it for "residential, recreational, commercial, industrial *or other purposes.*" (Italics supplied.) Examples of possible exercise of the

unrestrained power could be multiplied and applied to "inadequate planning of the area, or excessive land coverage by the buildings thereon . . . defective design and arrangement of the building thereon, or faulty street or lot layout, or economically . . . land uses." Delegation of this power to determine what shall constitute the jurisdictional facts is an *unlawful delegation of legislative power*.

This unlawful delegation of power remains unaffected by the provision requiring approval of the authority's redevelopment proposal by the "governing body." Section 4(a) of the Act states that the Authority "shall in no way be deemed to be an instrumentality of such city or county, or engaged in the performance of a municipal function." It matters not, therefore, whether a city council or a board of county commissioners approves the redevelopment plans. Not being a municipal function, approval by the respective bodies cannot be said to be the act of a representative of the people. Designation of a local magistrate ,or any other person or officer of the Commonwealth, a municipality, county or borough, as the one whose approval is required would be equally ineffective. The power to determine what the law shall be remains in the planning commission and the Authority.

Analysis of the statutes of 23 States, referred to in the majority opinion as being similar to the statutes under consideration, reveals that a majority are slum clearance statutes, similar to the Pennsylvania Housing Authorities Law, Act of 1937, P. L. 955, 35 PS 1541, et sec., the constitutionality of which was sustained in *Dornan v. Philadelphia Housing Authority*, 331 209, 200 A. 834. The constitutionality of statutes dealing with redevelopment and encompassing similar purposes has not been determined by the appellate courts in any State. The distinction between the two types of statutes is clear when their scope is considered. The decision of this Court in *Dornan v. Philadelphia Housing Author-*

*ity,* supra, is inapposite, either by comparison, analogy or otherwise.

I have been unable to find a single case wherein the constitutionality of a redevelopment law, as distinguished from a slum clearance law, was involved. I know of no other statute which has been upheld by this Court wherein power has been delegated to an administrative agency or body politic to determine *what shall constitute its own jurisdictional* facts. Certainly, this Court has never sustained a delegation of power to determine what shall constitute a *jurisdictional fact.* To the contrary, such delegation of power has been held unconstitutional: *Wilson v. Philadelphia School District,* supra.

The conclusion of the majority is contrary to established principles of constitutional law *and is a license to the legislature to place in the hands of persons, neither representatives of the people nor responsible to them in any manner, power to determine arbitrarily what shall constitute the law which is to be administered by them.*

The decree of the court below should be reversed and the relief prayed for granted.