# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Condemnation by the General Municipal Authority of the City of Nanticoke | : : : : : | No. 1426 C.D. 2021 ARGUED: December 12, 2022 |
| Appeal of: Clifford J. Pomicter and Mary Lou Pomicter | : : | |
| | | |
| In Re: Condemnation by the General Municipal Authority of the City of Nanticoke | : : : : : | No. 1427 C.D. 2021 |
| Appeal of: Nilved Apartments, LLC | : | |

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION BY**
**SENIOR JUDGE LEADBETTER**                    **FILED:  March 27, 2023**

Clifford J. and Mary Lou Pomicter and Nilved Apartments, LLC (collectively, Condemnees), appeal from the Court of Common Pleas of Luzerne County's orders which overruled their preliminary objections to amended declarations of taking of their respective properties by the General Municipal Authority of the City of Nanticoke.  The cases were not formally consolidated by the trial court but were heard together; the trial court entered separate but substantively identical orders and opinions in each of the separately docketed

matters.[1]  For the reasons that follow, we vacate the trial court's orders and remand these matters for proceedings consistent with this opinion.

In August 2018, the Authority filed declarations of taking for lands belonging to Condemnees.[2]  The declarations of taking stated that the purpose of the takings was as follows:

> 9.    The property has been condemned by the Authority for purposes of construction of a new five (5) story mix-use [sic] building in the City of Nanticoke, Luzerne County, Pennsylvania, that will include the construction of Affordable Apartments for Elderly that will be housed on the upper three floors of the building, a Living Independently For Elders (LIFE) Center along with an lnter Modal transit office and a residential entry lobby that will be located on the ground floor, and a parking garage that will be located on the second floor.
>
> 10.    The purpose of the construction of a the [sic] new mix[-]use building is to provide affordable housing to senior citizens in the City of Nanticoke, as well as to provide affordable and accessible public transportation to the elderly residents of the City of Nanticoke.

[Decl. for Pomicter Prop., ¶¶ 9-10, Reproduced R. "R.R." at 2a; Decl. for Nilved Prop. ¶¶ 9-10, R.R. at 15a (identical).]  The declarations further stated as follows: "[t]his condemnation is in the public interest to maintain a healthy and safe quality of life for the City of Nanticoke's elderly residents."  (Decl. for Pomicter Prop. ¶ 12, R.R. at 3a; Decl. for Nilved Prop., ¶ 12, R.R. at 16a.)

---

[1] In June 2022, this Court entered an order consolidating the above-captioned matters.

[2] There is some confusion as to when the first declarations were authorized—the declarations state May 21, 2018, but the actual authorization seems to have been voted upon at a meeting of the Authority on July 23, 2018.  (May 6, 2021 Hr'g, Ex. D-4, Reproduced Record "R.R." at 224a.)

Condemnees filed preliminary objections to the declarations of taking. Instead of responding to the preliminary objections, in October 2018 the Authority authorized amended declarations of taking for the properties (Auth. Bd. Minutes, R.R. at 320a) and filed amended declarations of taking in both matters. The amended declarations elaborated on the earlier stated purpose, adding that there was also an infrastructure and economic development purpose to the taking and stating:

> 11. The property has been condemned by the Authority for purposes of construction of a new five[3] (5) story building in the City of Nanticoke, Luzerne County, Pennsylvania, that will include the construction of Affordable Apartments for Elderly that will be housed on the upper three floors of the building, a Living Independently For Elders (LIFE) Center along with an Inter Modal Public Transit office and a residential entry lobby that will be located on the ground floor, and a parking garage that will be located on the second floor.
>
> 12. The purpose of the construction of a building is to provide public transportation and affordable housing to senior citizens in the City of Nanticoke, and *to improve the infrastructure, streetscape, pedestrian safety, and economic development of the City of Nanticoke*[.]

[Am. Decl. for Pomicter Prop. ¶¶ 11-12, R.R. at 94a-95a (emphasis added; footnote added); Am. Decl. for Nilved Prop., ¶¶ 11-12, R.R. at 108a-09a (identical).] The amended declarations stated, with greater specificity, that "[t]his condemnation is in the public interest to maintain a healthy and safe quality of life for the City of Nanticoke's elderly residents *and to improve the infrastructure, streetscape, pedestrian safety, and economic development of the City of Nanticoke*." [Am. Decl. for Pomicter Prop., ¶ 14, R.R. at 95a (emphasis added); Am. Decl. for Nilved Prop.,

---

[3] In Paragraph 11 of the amended declarations, the words "mix-use" were not used at this point, as they were in the corresponding Paragraph 9 in the original declarations of taking.

¶ 14, R.R. at 109a.] The record indicates that the proposed multi-use building is referred to as the "Nantego Project" and the improvements to the street are referred to as the "Streetscape Project," to be overseen by the Pennsylvania Department of Transportation (PennDOT).

Upon the Authority's filing of the amended declarations, the trial court *sua sponte* issued orders dismissing Condemnees' initial preliminary objections as moot. Condemnees then filed preliminary objections to the amended declarations of taking, to which the Authority filed responses.

After considerable delay caused by discovery disputes and the COVID-19 pandemic, a hearing on the merits was held on May 6, 2021, before the Honorable Thomas F. Burke, Jr. Condemnees presented the testimony of Mary Lou Pomicter, who with her husband owns one of the properties taken, and Debra Massaker, owner of Nilved Apartments; Stephen R. Sartori, Transportation Division Manager and Associate Vice-President of Pennoni Associates, Inc., an engineering firm, who was engaged by PennDOT to oversee a street widening as part of the Streetscape Project, a large project to improve and beautify downtown Nanticoke; and John Nadolny, Chairman of the Authority. The Authority presented the testimony of Martin Fotta, Vice-President of Community Development of a non-profit entity called United Neighborhood Community Development Corporation, a social service agency involved with the Nantego Project, and Mr. Nadolny.

After the hearing, the parties submitted proposed findings of fact and conclusions of law. In December 2021, the Authority contacted the trial court concerning Judge Burke's impending retirement at the end of the year, inquiring when a decision would be issued (the trial court apparently did not docket the letter, which is therefore not part of the record). On December 7, 2021, the trial court

4

issued orders overruling the preliminary objections to the amended declarations. Condemnees filed timely notices of appeal and the trial court, by Judge Burke, issued orders under Pennsylvania Rule of Appellate Procedure 1925(b) directing Condemnees to file concise statements of errors complained of on appeal.

At the end of 2021, Judge Burke retired from the bench. On January 6, 2022, Condemnees filed their Rule 1925(b) statements to which the Authority filed responses. On March 3, 2022, a judge newly assigned to the case, the Honorable Tina Polachek Gartley, issued orders and opinions under Rule of Appellate Procedure 1925(a). Of note, Judge Polachek Gartley indicated that her decisions were based upon, *inter alia*, "Judge Burke's notes in the file" as well as review of the record and transcript. (Pomicter Op. at 2; Nilved Op. at 2.) Judge Burke's file notes are extraneous to the record and their contents are not indicated in the body of the opinions. With regard to the key issue of whether the purpose stated in the amended declarations was the actual purpose of the takings, the trial court made no discrete findings of fact or conclusions of law. Rather, the trial court relied generally upon the presumption of good faith and the heavy burden to show bad faith or abuse of discretion as well as the testimony of Mr. Fotta (May 6, 2021 Hr'g, Notes of Test. "N.T." at 88-115, R.R. at 212a-18a) in concluding that the Authority's use of eminent domain was permissible under Sections 5607(d)(15) and 5615(a) of the Municipality Authorities Act (MAA), 53 Pa.C.S. §§ 5607(d)(15) and 5615(a), and was for a purpose consistent with Section 5607(a)(2) and (3) of the MAA, 53 Pa.C.S. § 5607(a)(2)-(3). With regard to another key issue, whether the takings violated Section 204(a) the Property Rights Protection Act (PRPA), 25 Pa.C.S. § 204(a), the trial court again relied upon the presumption of propriety and the testimony of Mr. Fotta without making findings of fact or conclusions of law.

5

On appeal, Condemnees style their questions presented as a single issue: whether the trial court erred and abused its discretion when it overruled the preliminary objections to the amended declarations of taking. However, the body of the brief reveals that Condemnees actually raise several arguments,[4] which we have reordered for organizational purposes and paraphrased slightly for clarity:

(1) Whether the MAA is unconstitutional because it permits takings which are only partially for public uses;

(2) Whether the Authority improperly filed amended declarations without leave of the trial court or consent of Condemnees;

(3) Whether the takings are validly authorized by ordinance, resolution, or otherwise under Section 302(b) of the Eminent Domain Code, 26 Pa.C.S. § 302(b);

(4) Whether the Authority sufficiently identified the Pomicter property;

(5) Whether the MAA grants the Authority power to condemn for either its stated purpose or what Condemnees contend is the Authority's "true purpose";

(6) Whether the takings are for a valid public purpose;

(7) Whether the takings are excessive; and

(8) Whether the takings violate Section 204(a) of the PRPA, 26 Pa.C.S. § 204(a), because they take private property to use for private enterprise.

Condemnees ask the Court to reverse the trial court's orders overruling their preliminary objections to the amended declarations and remand. Condemnees also

---

[4] Condemnees note that they objected to the Authority's service of the original and amended declarations to Nilved but acknowledge that the improper service was non-prejudicial and therefore abandon the issue. (Condemnees Br. at 52.)

6

ask the Court to direct the trial court upon remand to revest title to them under 26 Pa.C.S. § 306(f)(1), award costs and expenses pursuant to 26 Pa.C.S. § 306(g), and grant just compensation for the temporary taking of their properties.

We decide the first four questions raised by Condemnees as they either present pure issues of law or can be adequately reviewed on the current record. We do not reach the merits of the other arguments raised, as they present factual questions which require further development by the trial court.

## I.    Section 5607(a)(2), (3), and (17) of the MAA Survives Condemnees' Facial Constitutional Challenge

Condemnees mount a facial constitutional challenge to paragraphs (2), (3), and (17) of Section 5607(a) of the MAA,[5] arguing that the language in paragraph

---

[5] Section 5607(a) provides in relevant part as follows:

> (a) Scope of projects permitted.—Every authority . . . shall be for the purposes of . . . acquiring, holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee, projects of the following kind . . . :
>
> . . . .
>
> (2) Buildings to be devoted wholly or partially for public uses, including public school buildings, and facilities for the conduct of judicial proceedings and for revenue-producing purposes.
>
> (3) Transportation, marketing, shopping, terminals, bridges, tunnels, flood control projects, highways, parkways, traffic distribution centers, parking spaces, airports and all facilities necessary or incident thereto.
>
> . . . .
>
> (17) Industrial development projects, including, but not limited to, projects to retain or develop existing industries and the development

**(Footnote continued on next page…)**

7

(2) permitting a taking "partially for public uses," 53 Pa.C.S. § 5607(a)(2), as well as language in paragraphs (3) and (17) permitting takings for uses which are not exclusively designated as public or are non-public, such as transportation, marketing, and shopping, 53 Pa.C.S. § 5607(a)(3), and industrial development, 53 Pa.C.S. § 5607(a)(17), means that the statute permits the exercise of eminent domain for private gain.  Condemnees assert that such non-public uses violate state and federal constitutional protections stating that a property may be taken for "public use."  U.S. Const. amend. V;[6] Pa. Const. art. I, § 10.[7]

While both the federal and state constitutions require that property taken must be for a "public use," the constitutional meaning of "public use" is broader than actual "use" by the public.  Snitzer, Pennsylvania Eminent Domain § 1.2.2.1 (2023 ed.).  In *Kelo v. City of New London*, 545 U.S. 469 (2005), the United States Supreme Court stated that since it began applying the Fifth Amendment to the States at the close of the 1800s, it has "embraced the broader and more natural interpretation of public use as 'public purpose.'"  *Id.* at 480.  The Court stated that "[w]ithout exception, our cases have defined [public purpose] broadly, reflecting our longstanding policy of deference to legislative judgments in this field."  *Id.*

---

of new industries, the development and administration of business improvements and administrative services related thereto.

53 Pa.C.S. § 5607(a)(2)-(3), (17).

[6] The Fifth Amendment provides, in pertinent part, as follows: "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.

[7] Article I, section 10 provides in relevant part as follows: "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."  Pa. Const. art. I, § 10 (relating to eminent domain).

8

The courts of this Commonwealth take a somewhat more complex approach to the meaning of public use, rejecting legalistic formulae, instead leaving the definition to "the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration." *In re Condemnation by City of Coatesville*, 822 A.2d 846, 855 (Pa. Cmwlth. 2003) [quoting *Dornan v. Phila. Housing Auth.,* 200 A. 834, 840 (Pa. 1938)]. "A taking is proper if the benefit to the public is primary and any benefit to a private individual is only incidental." *In re Condemnation of Land for the Dev. of the S.E. Cent. Bus. Dist. Redev. Area #1*, 946 A.2d 1143, 1147 (Pa. Cmwlth. 2008). The question of what constitutes a public use is highly fact-dependent. *Reading Area Water Auth. v. Schuylkill River Greenway Ass'n*, 100 A.3d 572, 580 (Pa. 2014). A "taking does not lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefited." *In re Legis. Route 62214, Section 1-A*, 229 A.2d 1, 3 (Pa. 1967) (quotation omitted).

Although subject to limitations made in the judgment of the General Assembly which we discuss, *infra*, under the federal and state constitutions, the occurrence of incidental private benefit does not categorically prohibit individual takings which benefit the public. In light of this, we cannot find that the constitutional protections in question provide a ground for a facial challenge to Section 5607(a)(2), (3), and (17) of the MAA.

## II. The Trial Court Allowed the Authority to File Amended Declarations

Condemnees argue that the amended declarations were improperly filed because the Authority obtained neither leave of court nor Condemnees' consent and

9

because Condemnees raised issues of fact in their preliminary objections to the original declarations and the trial court did not hold an evidentiary hearing to determine those issues of fact. Section 306(f)(3) of the Eminent Domain Code provides that the "[t]he [trial] court may allow amendment or direct the filing of a more specific declaration of taking." 26 Pa.C.S. § 306(f)(3). It does not prescribe a specific procedure by which the trial court may "allow" the amendment of a declaration.

While leave was not sought or received from the trial court prior to the filing of the amended declarations, the trial court did *sua sponte* declare moot Condemnees' first round of preliminary objections and directed Condemnees to file a response to the amended declaration, allowing the proceedings to move forward pursuant to the amendments. Additionally, Condemnees pursued the issue at the hearing and the trial court verbally stated that it was overruling the preliminary objection concerning the amendment to the declaration.[8] Finally, in its Rule 1925(a) opinion, the trial court—albeit by a different judge—stated that had the Authority

---

[8] In open court, Judge Burke explained why he was overruling this preliminary objection. He did not address the meaning of Section 306(f)(3), but did express surprise that after approximately 31 months of litigation prefatory to the hearing, including phone conferences, counsel for Condemnees did not "signal[] to opposing counsel and to the Court in a meaningful way" that "would have indicated that this is a threshold issue and it [would] save a lot of time and effort with scheduling and bringing people into court and so forth if [Condemnees were] correct on it." (N.T. at 15, R.R. at 193a.) The trial court stated as follows:

> I simply don't believe that it's warranted at this stage to go backward hypothetically unless I'm mistaken about this. If these grounds were to be sustained, there is no preclusion against the [A]uthority refiling all paperwork with the same project and the same condemnations attending to the same and going through the process all over again.

(*Id.*)

10

sought permission to amend, it would have been granted and the trial court would not have sustained the preliminary objection to the amendments or terminated the condemnations such that the fee-shifting provisions of Section 306(g)[9] would have been implicated. This finding is fully supported by Judge Burke's actions. We conclude that the trial court did "allow" the amendment of the original declarations despite permission to file it not first having been sought.

### III. Condemnees Have not Shown that Condemnation was Not Validly Authorized by Ordinance

Condemnees argue that the condemnations were not validly authorized by ordinance because the minutes of the Authority's meeting containing the authorizations were not available for examination at the location listed in the amended declarations (the minutes were instead publicly distributed on the Internet). Section 302(b)(3) of the Eminent Domain Code provides that a declaration of taking must contain "[a] specific reference to the action . . . by which the declaration of taking was authorized, including the date when the action was taken and the place where the record may be examined." 26 Pa.C.S. § 302(b)(3).

Contrary to Condemnees' assertion, the principle of strict construction is not applied to nonprejudicial irregularities in the procedural aspects of

---

[9] Section 306(g) provides as follows:

> (1) If preliminary objections which have the effect of terminating the condemnation are sustained, the condemnor shall reimburse the condemnee for reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred because of the condemnation proceedings.

> (2) The court shall assess costs and expenses under this subsection.

26 Pa.C.S. § 306(g).

11

condemnation. *Avery v. Com.*, 276 A.2d 843, 845 (Pa. Cmwlth. 1971). Thus, procedural irregularities will not set aside a condemnation decision where the condemnee has not been prejudiced. *In re Condemnation by Com. of Pa., Dep't of Transp., of Right-of-Way for State Route 0079, Section 290, A Ltd. Access Highway in Twp. of Cranberry*, 805 A.2d 59, 67 (Pa. Cmwlth. 2002). Here, no prejudice is alleged to have occurred and so this argument must fail. *See Appeal of Perry*, 461 A.2d 916, 918 (Pa. Cmwlth. 1983) (where minutes of meeting authorizing taking were referenced as attached to declaration of taking but were not so attached, the irregularity was harmless error).

**IV. Any Inadequacy in the Description of the Pomicters' Property in the Original Declaration of Taking was Rectified by the Amended Declaration**

Condemnees argue that the Authority failed to sufficiently identify the Pomicters' property as required by Section 302(b)(5) of the Eminent Domain Code, 26 Pa.C.S. § 302(b)(5), in the *original* declaration of taking. Section 302(b)(5) requires that a declaration be in writing and contain:

> A description of the property condemned, sufficient for identification, specifying the municipal corporation and the county or counties where the property taken is located, a reference to the place of recording in the office of the recorder of deeds of plans showing the property condemned or a statement that plans showing the property condemned are on the same day being lodged for record or filed in the office of the recorder of deeds in the county in accordance with [S]ection 304 [26 Pa.C.S. § 304] (relating to recording notice of condemnation).

26 Pa.C.S. § 302(b)(5). Although it is not entirely clear, Condemnees seem to be arguing that because the inadequate description resulted in attorneys' fees and costs to the Pomicters (resulting from the original preliminary objections) and because

12

they believe they would have won on this issue had the original round of preliminary objections been litigated without an amended declaration against the Pomicters' property being allowed by the trial court, they are entitled to those fees anyway. However, the fact of the matter is that an amended declaration was filed, it was allowed by the trial court, and the original preliminary objections were moot, *in toto*.

**V.      Remand for a Hearing *De Novo* and Findings of Fact and Conclusions of Law is Necessary for Review of the Remaining Issues Raised by Condemnees**

As they implicate common factual issues for which remand is necessary, we address together the remainder of Condemnees' arguments challenging the purpose(s) for which their properties were taken. While we believe that the substitute judge did the best she could do in her Rule 1925(a) opinion, we are impeded in our exercise of effective appellate review by the lack of specific findings of fact and therefore remand for further proceedings.

Briefly, these arguments involve Condemnees' allegation that the properties were being taken not for public use, but to benefit a private developer. They argue that the "true" purposes (which they allege to be the sale of the properties to a developer) of the takings are outside the legislature's grant of authority under Section 5607(a)(2), (3), and (17) of the MAA. Further, Condemnees argue that this "true purpose" is not a valid "public use" or "public purpose" under the Fifth Amendment of the United States Constitution and article I, section 10 of the

Pennsylvania Constitution,[10] either in its entirety or because it is excessive for its purpose,[11] and violates Section 204 of the PRPA.[12]

To be a valid taking, the public use must not only be one which satisfies the federal and state constitutions but must also be a permitted use under legislation delegating the authority.[13] Thus, the public use for which these takings were made must be statutorily authorized by one or more of paragraphs (2),[14] (3), and/or (17) of Section 5607(a) of the MAA. *In re Powell*, 260 A.3d 298, 308-309 (Pa. Cmwlth. 2021) (municipal authority to construct buildings devoted to public use under

---

[10] *See supra* nn.6-7.

[11] A planned taking must be tailored for the actual purpose or it will be overturned as excessive. *Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 338 (Pa. 2007); *see also Winger v. Aires*, 89 A.2d 521, 523 (Pa. 1952) (the taking of 55 acres for the public purpose of building a school was excessive for its purpose).

[12] Section 204 of the PRPA provides generally that "the exercise by any condemnor of the power of eminent domain to take private property in order to use it for private enterprise is prohibited." 26 Pa.C.S. § 204(a)

[13] Our Supreme Court has stated:

> Although the power is an inherent attribute of sovereignty, it is regulated by constitutional and statutory law, and thus, *it can only be exercised within the limitations established by law*. The Commonwealth may exercise the power of eminent domain directly or indirectly by delegating it. Because eminent domain is in derogation of private rights, any legislative authority for its use must be strictly construed in favor of the landowner.

*Reading Area Water Auth.*, 100 A.3d at 579.

[14] We note the parties disagree as to whether the public uses for building types listed in Section 5607(a)(2) after the word "including" are exclusive or examples. We decline to address this issue in the abstract given the fundamental disagreement as to the nature of the purpose of the proposed building.

14

Section 5607(a)(2) does not include condemnation of nearby properties to install power transmission lines for those buildings).

Also, the public use for which the properties are to be taken must not run afoul of the limitations of the PRPA. *Reading Area Water Auth.*, 100 A.3d at 582 (even assuming a condemnation can pass constitutional scrutiny, it must also be statutorily permissible). Section 204(a) of the PRPA prohibits generally the use of the power of eminent domain to take private property in order to use it for private enterprise. 26 Pa.C.S. § 204(a). Our Supreme Court explained in *Reading Area Water Authority* that the protections afforded by Section 204(a) are to be construed in light of the Legislature's post-*Kelo* intent to curtail abuse of the eminent domain power by effecting constitutionally permissible takings with substantial "ancillary" benefits to private enterprise:

> Notably, PRPA was passed as a direct reaction to *Kelo* to curb what legislators perceived as eminent domain abuse, and with the goal of striking a reasonable balance between (a) the need to defend private property rights from takings accomplished for economic development purposes, and (b) the legitimate needs of urban centers to rehabilitate blighted areas imposing substantial, concrete harm upon the public. *See, e.g.*, House Legislative Journal, Nov. 1, 2005, at 2169-72; Senate Legislative Journal, April 25, 2006, at 1552. Whether or not the *Constitution* viewed as merely "ancillary" the benefits to private enterprise ensuing from a plan to use eminent domain to assist in economic development, in the wake of *Kelo* the *Legislature* began to view such benefits as central and wanted to curtail the ability of condemnors to take others' property for such purposes. Against this backdrop, the legislative body elected to phrase the central prohibition broadly in terms of whether the subject property is being condemned "to use it for private enterprise," 26 Pa.C.S. § 204(a), rather than "to use it *solely* for private enterprise"—the latter of which, in any event, would have had little effect on the *status quo* since

15

> any condemnation accomplished solely for private purposes would likely have failed the constitutional public-use standard.

*Id.* at 583 (citation omitted). Clearly, the PRPA will not thwart a taking if there is a private benefit of any size or nature. While the constitutional analysis often focuses on weighing the respective *benefits* to the public and the private entity, requiring that the public must be found to be the *primary beneficiary* of the project, the analysis under the PRPA is slightly different. Under the PRPA the focus is on the *purpose* and the *ultimate use* to which the taking is directed. If the genuine purpose of the taking is for a public use, i.e., the public use is the true driving force behind the taking, the PRPA is satisfied even if the project results in some private gain. For instance, the taking of land to build a highway to mitigate traffic congestion clearly has a public purpose, even though a number of private contractors may profit from doing the work. On the other hand, if a road is being built solely in order to provide access to a proposed private development, that likely will not be a public purpose, even though other members of the general public may use the road. In other words, if the role of the private actor is to facilitate creation of a genuine public use that is permissible under the PRPA, even if some benefit accrues to the private entity (so long as that benefit is not so disproportionate—i.e., primary—as to fail the constitutional test).

Moreover, as noted by the parties, there are exceptions to Section 204(a)'s application provided by Section 204(b), including the following:

> Subsection (a) does not apply if any of the following apply:
>
> (2) The property is . . . transferred or leased to
>
> . . . .

16

(iii) A private enterprise that occupies an incidental area within a public project, such as retail space, office space, restaurant and food service facility or similar incidental area.

. . . .

(7) The property taken is acquired for the development of low-income and mixed-income housing projects pursuant to . . . the Housing Authorities Law,[15] or to be developed using financial incentives available for the development of low-income and mixed-income housing projects under [various state and federal statutes][.]

26 Pa.C.S. § 204(b)(2), (7)(i)-(vii) (footnote added).

In considering whether a public purpose authorized by statute was properly invoked, we look for the "real or fundamental purpose" behind a taking. *Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 337 (Pa. 2007) [quoting *Belovsky v. Redev. Auth.*, 54 A.2d 277, 283 (Pa. 1947)]. The stated purpose of the taking "must be the true purpose behind the taking," or the Authority would not have the power to act, and the taking would be *void ab initio*. *See id.* at 337-38. As noted, the question of what constitutes a public use is "highly fact-dependent," *Reading Area Water Authority*, 100 A.3d at 580; *see also City of Philadelphia v. Galdo*, 217 A.3d 811 (Pa. 2019) (determination of whether property is devoted to a public use is dependent upon the individualized facts of each case).

Resolution of these issues implicates the following common factual issues: (1) how the Authority actually plans to use the properties and (2) to whom the primary benefits would accrue. It is for resolution of these questions that we remand.

---

[15] Act of May 28, 1937, P.L. 955, *as amended*, 35 P.S. §§ 1541-1568.1.

The trial court's general reliance upon the testimony of Mr. Fotta, of the United Neighborhood Community Development Corporation, does little to facilitate review. Mr. Fotta's testimony (and that of other witnesses) is hardly illuminating as to what the plans are and to whom the benefits from them will inure. For instance, Mr. Fotta participated in the following exchange on cross-examination:

> Q  Would the equity investor own any portion of the building?
>
> A  The equity investor would be a partner in the partnership, yes.
>
> Q  At some point in time, their interests were terminated; is that correct?
>
> A  The equity investor? Yes.
>
> Q  Can you explain to the Court how that would work?
>
> A  They would be involved for 15 years, which is the compliance period.
>
> Q  What would happen to their interest at that point in time?
>
> A  They would sell to the general partner.
>
> Q  Who is the general partner?
>
> A  The general partner would be Nantego Associates. It's a limited partner.
>
> Q  Nantego Associates, is that a for-profit enterprise?
>
> A  It is, yes.

(N.T. at 101-02, R.R. at 215a.)  Mr. Sartori, the engineer engaged by PennDOT for the Streetscape Project, testified as follows:

> The idea is the [C]ity will sell the properties to the Nantego Group and complete a lot[-]consolidation of the project area but dedicate the right-of-way needed for the Streetscape as legal right-of-way for city streets so we do not have to acquire any of the right-of-way.

(N.T. at 27, R.R. at 196a.)  Mr. Sartori further testified:

> Q      What do they do with those properties once they're purchased?
>
> A      The purpose is to turn them over to a developer to revitalize the City of Nanticoke.
>
> Q      How does the Authority find the developer to turn them over to?
>
> A      Our consultant would advertise.

(N.T. at 70, R.R. at 207a.)  When asked who would own the proposed mixed-use building, Mr. Nadolny, Chairman of the Authority, answered that it would be the Nantego Corporation.  (N.T. at 80, R.R. at 210a.)  It is not clear from the record what the entities referred to are and what role they will play in the Nantego Project.[16]  It

---

[16] A search of the Pennsylvania Department of State's business entity search website for the name "Nantego" finds no entities registered called "Nantego Associates," "Nantego Corporation," or "Nantego Development Corporation," but, *inter alia*, two other entities called "Nantego": "Nantego Development LP," a Domestic Limited Partnership, and "Nantego LLC," a Domestic Limited Liability Company.  Pennsylvania Department of State Business Search, https://file.dos.pa.gov/search/business [search for "Nantego" (last visited on March 24, 2023)].  Both were formed on January 22, 2018, and are located at 1 East Green Street, Nanticoke.  *Id.* Nantego LLC is listed as general partner for Nantego Development LP.  *Id.* [follow hyperlink for "Nantego Development LP (6657065)"].

is even more unclear the magnitude of benefits Nantego and/or the "equity investor" will obtain from the project; the details of the public benefits in terms of housing and transportation for elderly citizens or the community's need for such services; or how PennDOT's right of way is involved.

On remand, we direct the trial court to hold a hearing *de novo* on the above-delineated factual issues, as well as to make necessary findings of fact and conclusions of law. While an evidentiary hearing on factual issues raised by the preliminary objections was held before Judge Burke, as required by Section 306(f)(2) of the Eminent Domain Code, 26 Pa.C.S. § 306(f)(2), the peculiar procedural posture of this case left a different judge to write an opinion supporting unexplained determinations by Judge Burke. Pennsylvania courts have addressed the legal consequences of a presiding judge's unavailability due to retirement, suspension, disability, resignation, or death where the record is left in an ambiguous state. We believe that the Supreme Court's explanation of what to do in such a situation remains apt:

> Ordinarily, where the record is in a confused state and the trial court has not made findings of fact, we would remand the proceedings for appropriate factual determinations by the trial judge. In the present action, however, this is impossible since the trial judge has retired from the bench and is no longer available to make the necessary findings. Therefore, in order to protect against a possible miscarriage of justice in the present situation, a new trial is necessary to clarify the many ambiguities appearing on the record and to permit the rendering of necessary factual and legal determinations by a trial court.

*Ballinger v. Howell Mfg. Co.*, 180 A.2d 555, 557 (Pa. 1962); *compare Ercolani v. Dep't of Transp., Bureau of Driver Licensing*, 922 A.2d 1034 (Pa. Cmwlth. 2007)

20

(new hearing unnecessary where newly assigned judge accepted previous judge's determinations of credibility and weight of testimony). It is extremely unfortunate that resources must be expended in this pursuit, but we see no acceptable alternative. We simply cannot exercise effective appellate review in this case without necessary findings of fact.

In light of the foregoing, we vacate the trial court's orders and remand for proceedings consistent with the foregoing opinion.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Condemnation by the General Municipal Authority of the City of Nanticoke | : : : : : | No. 1426 C.D. 2021 |
| Appeal of: Clifford J. Pomicter and Mary Lou Pomicter | : : | |
| In Re: Condemnation by the General Municipal Authority of the City of Nanticoke | : : : : : | No. 1427 C.D. 2021 |
| Appeal of: Nilved Apartments, LLC | : | |

## **O R D E R**

AND NOW, this 27th day of March, 2023, the orders of the Court of Common Pleas of Luzerne County are VACATED. The matters are REMANDED for the purpose of a hearing *de novo* on the merits and the making of necessary findings of fact and conclusions of law consistent with the directives of this Opinion. Jurisdiction is RELINQUISHED.

 

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita