IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| In re: Condemnation by the | : |
| General Municipal Authority | : |
| of the City of Nanticoke | : |
| | : |
| Appeal of: Estate of Leonard D. | :  No. 681 C.D. 2024 |
| Nardozzo | :  Argued: September 9, 2025 |

BEFORE:  HONORABLE ANNE E. COVEY, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                          FILED: December 11, 2025


The Estate of Leonard D. Nardozzo (Condemnee)[1] appeals from the order of the Court of Common Pleas of Luzerne County (Trial Court) overruling its preliminary objections to the amended declaration of taking (Declaration) issued by the General Municipal Authority (Authority) of the City of Nanticoke (City) against Condemnee's property. The Authority Declaration was issued in furtherance of what is known as the "Nantego Project," a proposed mixed-use building. Upon review, we reverse the Trial Court's order.

---

[1] The Declaration listed Daniel Nardozzo as Condemnee. However, both he and his son, Leonard D. Nardozzo, are deceased. Leonard M. Nardozzo, administrator of the Estate of Leonard D. Nardozzo, was substituted as Condemnee. Order, *In re: Condemnation by the Gen. Mun. Auth. of the City of Nanticoke* (C.C.P. Luzerne, Docket No. 2022-06020, filed Jan. 16, 2024). The parties and legal issues in this matter are the same as those in *In Re: Condemnation by the General Municipal Authority of the City of Nanticoke, Appeal of Nilved Apartments, LLC* (Pa. Cmwlth., No. 880 C.D. 2024), which is being filed contemporaneously herewith.

# I. Background

The Declaration of Taking at issue here was initiated in 2022 and pursuant to Section 5607(a) and (d) of the Pennsylvania Municipality Authorities Act (MAA),[2] 53 Pa.C.S. § 5607(a) and (d), and Section 204(7) of the Pennsylvania Property Rights Protection Act (PRPA),[3] 26 Pa.C.S. § 204(7).[4] Reproduced Record (R.R.) at 2a. The averred purpose of the taking is to facilitate construction of a five-story building with affordable apartments for the elderly on the upper floors, an intermodal public transit office, a residential entry lobby, and a parking garage. *Id.* at 3a. Similarly, the purposes for the Nantego Project are to provide affordable housing for senior citizens, provide affordable and accessible public transportation to the residents of Nanticoke, and, through the parking structure, to improve the "infrastruct[ur]e, streetscape, pedestrian safety[,] and economic development of Nanticoke." *Id.* at 4a.

Condemnee filed preliminary objections challenging the Declaration. Relevant here, the preliminary objections assert that the taking is actually for a private purpose and, therefore, violates the "public purpose" requirements of state and federal constitutions;[5] contravenes Section 204 of PRPA, 26 Pa.C.S. § 204, which forbids taking private property for the use of private enterprise; and fails to fulfill a permitted purpose for condemnation under the MAA. In February 2024, the

---

[2] 53 Pa.C.S. §§ 5601-5623.

[3] 26 Pa.C.S. §§ 201-207.

[4] The pertinent statutory provisions are set forth in the Discussion section below.

[5] Pa. Const. art. I, § 10 & art. X, § 4; U.S. Const. amend. V.

Trial Court held a joint evidentiary hearing in this matter and that relating to Nilved Apartments, LLC.[6]

At the hearing, Condemnee presented the testimony of John Nadolny (Nadolny), Chair of the Authority's Board at the time of the takings; Ryan Verazin (Verazin), Executive Director of the Nanticoke Housing Authority (NHA), and Secretary to the New Horizons Development Corporation (New Horizons), a 501(c)(3)[7] nonprofit corporation formed by the NHA; Martin Fotta (Fotta), Chief Operating Officer of the United Neighborhood Community Development Corporation (United Neighborhood), another 501(c)(3) nonprofit corporation, which serves as a consultant to New Horizons; Donna Wall (Wall), the City's Manager; Kenneth Malia (Malia), current Chair of the Authority's Board and a Member at the time of the Declaration; Leonard M. Nardozzo, Condemnee's administrator; and Debra Massaker, who owns Nilved Apartments. The Authority presented the testimony of Sarah Hailstone (Hailstone), the principal of Hailstone Economic, a community and economic development consulting firm. Karen Welsh (Welsh), an

---

[6] The taking at issue is one of several the Authority undertook. *See, e.g.*, *In Re: Condemnation by the Gen. Mun. Auth. of the City of Nanticoke*, 292 A.3d 1162 (Pa. Cmwlth. 2023) (*Nanticoke I*). Previous takings were initiated in 2018. The condemnees whose appeals were the subject of *Nanticoke I* included Nilved Apartments, LLC, which has appealed a similar order of the Trial Court. *See* Notice of Appeal, *In Re: Condemnation by the Gen. Mun. Auth. of the City of Nanticoke, Appeal of Nilved Apartments, LLC* (Pa. Cmwlth., No. 880 C.D. 2024, filed Aug. 1, 2024). In *Nanticoke I*, this Court vacated the Trial Court's orders and remanded the matter for a hearing *de novo* with directions to make necessary findings of fact relating to the validity of the takings under the state and federal constitutions, PRPA, and the MAA, specifically "(1) how the Authority actually plans to use the properties and (2) to whom the primary benefits would accrue." *Nanticoke I*, 292 A.3d at 1174. Both the instant case and the appeal by Nilved Apartments after remand in *Nanticoke I* were initially scheduled for argument in April 2025 but were continued at the request of counsel for Condemnee, who also represents Nilved Apartments.

[7] 501(c)(3) refers to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), which relates to corporations organized and operated exclusively for charitable purposes.

architect and the president of Upstreet Architects, Inc., testified for the Authority through a deposition, portions of which were submitted in evidence by stipulation.

The Trial Court made extensive findings of fact, summarizing the testimony of the above witnesses and finding the testimony of Nadolny, Verazin, Fotta, Wall, Malia, Hailstone, and Welsh to be credible. R.R. at 668a-98a. The Trial Court found that the testimony of Leonard M. Nardozzo and Massaker offered insight into the background but "did not provide competent evidence to their claim that the 'true purpose' of the takings being anything other than that suggested by the [Authority]." *Id.* at 696a.

We observe that the planning and transactions concerning the Nantego Project are complex and, notably, somewhat uncertain at this point, with the conduct of further work hinging upon the outcome of this litigation. It is also apparent from the record and the Trial Court's findings that some of the witnesses had a limited understanding of the details of the Nantego Project and/or had limited recall of events, some of which occurred as far back as 2017. With that background, we summarize the Trial Court's findings as follows.

The first floor of the Nantego Project is to include a transportation center operated by the Luzerne County Transportation Authority (LCTA) and commercial space to be rented by a tenant; the second floor, a parking lot to be used by residents of the upper floors and also by the public; and the third through fifth floors, 40 apartments for low-income senior citizens. Further, some of the property condemned for the project would be conveyed to and used by the Pennsylvania Department of Transportation (PennDOT) for what is referred to as a streetscape or street widening project. Nadolny indicated that the Nantego Project and the streetscape project were two separate undertakings working in conjunction because

4

of their position on Main Street. However, Nadolny also attended meetings regarding the Nantego Project during which a representative of PennDOT appeared regarding the streetscape project.

No leases have been signed for the project, as progress has stalled due to ongoing litigation. Some potential tenants for the commercial space have found other space during the pendency of the lengthy litigation surrounding the project. The local YMCA and a healthcare facility discussed leasing the commercial space, but negotiations have ceased. In addition, LCTA has expressed reservations about outbound bus access.

Nadolny and Malia testified that the Authority intended to condemn the properties needed for the project and then convey them to the developer. Verazin and Fotta testified that the developer was to be New Horizons. New Horizons has a five-member board comprised of three members from the NHA Board and two members of the public, without term limits. According to Verazin, New Horizons was formed as a branch of the NHA to purchase properties in the City to house low-income tenants and manage those properties. There is, however, no written agreement between the Authority and New Horizons cementing New Horizons' rights and responsibilities specifically relating to the Nantego Project.

Prior to voting on the Nilved Apartments condemnation, the Authority's Board received information showing a proposed building or project from what Nadolny referred to as the "Nantego Corporation."[8] R.R. at 672a n.2. NHA itself has no role in the Nantego Project. New Horizons formed Nantego LLC, a domestic limited liability company. Nantego LLC is now the sole shareholder of

---

[8] As noted in *Nanticoke I*, there is no "Nantego Corporation," but there are other entities containing the word "Nantego" related to the project, including Nantego LLC and Nantego Development LP, discussed *supra*. *Id.*, 292 A.3d at 1174 n.16.

New Horizons. Nantego LLC in turn formed Nantego Development LP. Nantego Development LP would manage and eventually own the building.

New Horizons executed a contract with United Neighborhood for the latter to consult on the project. R.R. at 92a, 144a & 179a; *see also id.* at 94a. United Neighborhood develops affordable housing by ascertaining funding, developing projects, and overseeing construction. *Id.* at 91a-92a & 212a; *see also id.* at 211a & 213a (describing United Neighborhood as "a social service agency" involved with the Nantego Project). Under the terms of the contract, United Neighborhood would obtain low-income housing tax credits and receive a 40% share of the developer's fee.[9] The only written agreement found by the Trial Court is that between New Horizons and United Neighborhood. *See* R.R. at 225a-26a (testimony concerning the agreement). Verazin and Fotta each testified that their organizations, as 501(c)(3) nonprofits, would not be involved in a project designed to generate revenue for a private enterprise.

Nantego Development LP would be formed upon successful acquisition of the tax credits and would own and manage the building. New Horizons would be the general partner in Nantego Development LP and the private equity investor would be a limited partner but would own the vast majority of the partnership, and

---

[9] The Trial Court did not make findings concerning the nature of the developer's fee. Fotta testified that

> [t]he developer's fee is paid out in increments throughout the course of the project. First piece is paid out at closing, and then as the equity comes into the project, additional fees come in later. There's one upon construction completion, there's one upon complete occupancy of the building, and there's one at the end, which is called stabilization of the project.

R.R. at 225a-26a. The developer's fee amount has not been determined but is "based on ten percent of the entire development cost." *Id.* at 226a.

6

New Horizons would have only a fractional interest. Nantego Development LP would own the building for the duration of a 15-year compliance period. At the conclusion of the 15 years, the limited partnership would sell the building to either New Horizons or Nantego LLC. The partnership agreement would require approval by the Pennsylvania Housing Finance Agency (PHFA) and would limit what could be done with the building. Restrictive covenants would be placed on the property which would run with the land and would limit the use of the property to low-income senior housing for a period of time not established in the record; the notes of testimony indicate as little as 4 years and as many as 40.[10]

The Trial Court credited Fotta's testimony that low-income housing tax credits are the "primary source of funding for any new affordable housing development in the United States today." R.R. at 230a. The tax credits would be obtained from PHFA. United Neighborhood has not applied for the tax credits, asserting that it cannot do so until the New Horizons has "site control," or "proof that we have the ability to buy the building [sic] from the owner, and that we would be able to purchase the building [sic] and proceed with the project." R.R. at 254a.

The only role of the Authority in the project is to obtain site control. Once the tax credits could be obtained, United Neighborhood could look for the best pricing for the tax credits from an equity investor and sell them to the one that offered the best terms. Additional funding would come from grants that the City has already obtained. Wall, the City Manager, testified that the City has been awarded $1,000,000 in Redevelopment Assistance Capital Program funding and $120,000 in

---

[10] The Trial Court noted that while the notes of testimony indicated that Fotta testified the covenants would run for 4 years, later testimony and the Trial Court's recollection indicated that he "said/meant" 40 years. Condemnee Br., Appendix at 18 n.4; *see also* R.R. at 216a (restrictive covenants last for 4 years), 258a-59a (restrictive covenants placed on the property run with the land and limit the property usage to affordable senior housing for up to 40 years).

additional local share grant funding (from local gaming moneys).  Local share funds are restricted to the specific request contained within the grant, but the applicant can apply for a modification or change in the usage for the grant.

The Trial Court made the following findings summarizing its view of the evidence received on remand:

> 191.  There is copious evidence that from the time leading up to the [d]eclaration[] of [t]aking, and thereafter, the Nantego [P]roject, with some incidental variations in commercial use of the first level, would consist of a first level for an intermodal [transportation] center and some commercial retail space, the second level for parking, and the upper three levels for affordable housing for seniors.
>
> . . . .
>
> 193.  As set forth in its "[d]eclaration of [t]aking[,]" [the Authority], relying on [Sections] 5607(a)(2), (a)(3), (a)(17) and (d)(15), among other provisions of the MAA, condemned the subject property for the "purposes of construction of a new five (5) story building in . . . Nanticoke . . . that will include the construction of affordable apartments for elderly which will be housed on the upper floors of the building, an intermodal public transit office, a residential entry lobby, and parking garage."  Furthermore, [the Authority] stated that the "purpose of the construction project is to provide affordable housing to senior citizens in . . . Nanticoke as well as to provide affordable and accessible public transportation to the elderly residents of . . . Nanticoke and through the parking structure to improve the infrastructure, street[]scape, pedestrian safety, and economic development of . . . Nanticoke."

Condemnee Br., Appendix at 28-29 (citations omitted).

The Trial Court concluded that "the primary and 'true purpose' of the . . . Authority's condemnation is in accord with its stated purpose of providing affordable housing to senior citizens in . . . [the City], as well as to provide affordable

8

and accessible public transportation to the elderly residents . . ."; that the purpose was a "valid public purpose"; that the Authority has the power to condemn the property for its stated purpose pursuant to Section 5607(a)(2) and (a)(3) of MAA; that the taking is not excessive; and that the taking does not violate Section 204(a) of PRPA, 26 Pa.C.S. § 204(a), because the exception to its applicability set forth in Section 204(b)(7), 26 Pa.C.S. § 204(b)(7), applies and, in addition, the public use is the genuine and paramount purpose for the taking. Condemnee Br., Appendix at 30-31.

Condemnee appealed the Trial Court's order. The Trial Court issued an opinion in support of its order under Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 1925(a), organized around its conclusions of law. Of note, the Trial Court explained regarding its third conclusion of law that the MAA included within its scope of projects permitted "buildings to be devoted wholly or partially for public uses," 53 Pa.C.S. § 5607(a)(2), and projects related to "transportation . . . [and] . . . parking spaces," 53 Pa.C.S. § 5607(a)(3). Regarding its fourth conclusion of law, the Trial Court explained as follows:

> Fotta testified credibly that the plans for the Nantego building encompass the entire block of East Main Street between Walnut and Shea Streets, including [Condemnee's property], and, therefore, it would be impossible to construct the building as planned without acquiring [this] parcel[]. Clearly if the entire parcel is required in order to construct the planned building which would encompass a full city block, the taking was not "excessive."

Condemnee Br., Appendix at 35 (some quotation marks omitted). With regard to its fifth conclusion of law, that the taking does not violate Section 204(a) of PRPA, 26 Pa.C.S. § 204(a), the Trial Court explained that the "the exception . . . set forth in

9

Section 204(b)(7), 26 Pa.C.S. § 204(b)(7)] applies and, in addition, the public use is the genuine and paramount purpose for the taking." *Id.* at 36.

## II. Issues

Condemnee raises several issues,[11] which we reorder, combine, and restate as follows: (1) whether MAA grants the Authority power to condemn private property and immediately resell it to a private developer for the purpose of constructing the Nantego Project; (2) whether the condemnations are prohibited by PRPA; (3) whether the Trial Court erred in concluding the purpose of the taking was to provide housing for seniors and public transportation for elderly residents and in concluding the public would be the primary beneficiary of the Nantego Project; and (4) whether the taking is excessive.

## III. Discussion

### A. Takings Permitted under Section 5607(a) of the MAA

Section 5607(a) of the MAA provides, in pertinent part:

Scope of projects permitted.--Every authority incorporated under this chapter . . . shall be for the purposes of financing working capital; acquiring, holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee, projects of the following kind and character and providing financing for insurance reserves:

. . . .

(2) Buildings to be devoted wholly or partially for public uses, including public school buildings, and facilities for

---

[11] Whether a taking is for a public purpose under caselaw addressing the public use requirement for a condemnation under eminent domain powers presents a question of law, over which this Court's standard of review is *de novo* and its scope of review is plenary. *See Wolfe v. Reading Blue Mountain & N. R.R. Co.*, 320 A.3d 1164, 1170 (Pa. 2024) (citing *Pa. Env't Def. Found. v. Commonwealth*, 279 A.3d 1194, 1202 (Pa. 2022)).

the conduct of judicial proceedings and for revenue-producing purposes.

(3) Transportation, marketing, shopping, terminals, . . . . highways, parkways, traffic distribution centers, parking spaces, . . . and all facilities necessary or incident thereto.

. . . .

(17) Industrial development projects, including, but not limited to, projects to retain or develop existing industries and the development of new industries, the development and administration of business improvements and administrative services related thereto.

53 Pa.C.S. § 5607(a)(2)-(3), (17).

With regard to the Authority's role, which is solely site acquisition for the project, Subsection (d)(4) provides that a municipal authority may "exercise all powers necessary or convenient for the carrying out" its purposes (i.e., the scope of projects permitted by Section 5607(a)), including to "acquire, purchase, [or] hold . . . any . . . [real] property . . . necessary or desirable for carrying out the purposes of the authority, and to sell, . . . transfer and dispose of any property at any time acquired by it." 53 Pa.C.S. § 5607(d)(4). The Authority may also "acquire by purchase . . . or otherwise . . . to construct . . . projects," 53 Pa.C.S. § 5607(d)(5), and has the power of eminent domain, 53 Pa.C.S. § 5607 (d)(15).

Condemnee argues that Section 5607(a) and (d) of the MAA do not authorize the Authority to take property for the proposed purposes. Condemnee asserts that the Authority's lack of a role beyond the acquisition of the properties and immediate sale to another entity for development is outside its authority under Section 5607(a) of the MAA. Condemnee also contends that the proposed uses are not authorized under Section 5607(a) of the MAA.

11

While several of the uses found by the Trial Court fall within the scope of projects explicitly permitted under Section 5607(a)(2)-(3) and (17) of the MAA, which the Authority claimed as authority for the taking, the uses of affordable senior housing and commercial space do not. Housing is not a specifically enumerated "public use" under Section 5607(a)(2) the MAA. In *Nanticoke I*, we specifically declined to address on the record presented whether the words after "including" in Section 5607(a)(2) are "exclusive or examples." 292 A.2d at 1172 n.14. Returning to this issue, affordable housing for seniors does not constitute an enumerated use under Section 5607(a)(2) or any use under paragraph (a)(3) or (a)(17). However, we conclude that the broad phrase "public uses" in Section 5607(a)(2) includes projects to provide affordable senior housing.

Nearly a century ago, the Pennsylvania Supreme Court held that a project to provide affordable housing constituted a public use enabling acquisition of property by eminent domain. *Dornan v. Phila. Hous. Auth.*, 200 A. 834, 843 (Pa. 1938). Observing that "[t]he marked tendency of modern decisions is in aid of city planning and the improvement of housing conditions[,]" our Supreme Court explained:

> On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the conclusion that judicial interpretation of "public use" has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of

12

the scope and functions of government, so that to-day [sic] there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of "public use" naturally expands in proportion. Some of the factors involved in the proposed operation of the new housing projects which are emphasized . . . as being opposed to the theory of a public use prove, upon analysis, to be of little or no weight in the consideration of that subject. Thus the fact that the dwellings cannot and will not be occupied by all, but only by a few of the public having the prescribed qualification of poverty, is wholly lacking in legal significance, because the same may be said as to jails, poorhouses, and indeed many other institutions which are necessarily confined to a use, voluntary or involuntary, by certain selected portions of the population. An occupancy by some may promote, or even be vital to, the welfare of all. Nor is importance to be ascribed to the circumstance that some persons -- the tenants -- will from time to time receive more benefit from the use of the dwellings than the general public. The same observation would apply to hospitals and schools. The taking of land for a public golf course or playground would be for a public use although, while some players are using it, all other members of the public are necessarily excluded from utilizing and enjoying the facilities. The difference in the duration of occupancy in these various instances is one of degree. It is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one[.] An enterprise does not lose the character of a public use because that use may be limited by circumstances to a comparatively small part of the public . . . .

*Id.* at 840-41 (internal citations and quotation marks omitted).

*Dornan* applied housing laws including, *inter alia*, the then-recently enacted Housing Authorities Law, Act of May 28, 1937, P.L. 955, 35 P.S. §§ 1541-1568.1. Although the housing authority here is not involved in the taking at issue,

13

we discern no reason to define a public use or purpose differently merely because the Authority rather than the Municipal Authority is the entity exercising eminent domain power. Accordingly, we conclude that the exercise of eminent domain power in furtherance of a project to provide low income housing for seniors constitutes a public use or purpose.

As set forth above, public transportation is expressly authorized as a basis for eminent domain under the MAA. *See* 53 Pa.C.S. § 5607(a) (3) (identifying transportation "and all facilities necessary or incident thereto" as authorized bases of eminent domain). This Court has likewise identified the exercise of eminent domain power to improve public transportation as a public use or purpose. *See In Re: Condemnation by Dep't of Transp. of Right-of-Way for State Route 0022, Section 034*, 194 A.3d 722, 736 (Pa. Cmwlth. 2018).

Similarly, providing a public parking garage is a public use or purpose for which the exercise of eminent domain power is proper. *See* 53 Pa.C.S. § 5607(a)(3) (identifying the provision of "parking spaces" as an authorized purpose for eminent domain); *see also Seligsohn v. Phila. Parking Auth.*, 194 A.2d 606, 607 (Pa. 1963) (recognizing that construction of a parking garage is an appropriate purpose of eminent domain).

As discussed above, the building to be constructed will have five stories, with low income senior housing on the third through fifth floors, parking for the public and the tenants on the second floor, and a transportation facility and an unspecified commercial tenant or tenants on the first floor, along with a street widening project. Regarding the first floor rental space, we observe that the MAA authorizes the exercise of eminent domain power in connection with "[b]uildings to

14

be devoted wholly or partially for . . . revenue-producing purposes," "shopping," and "business improvements." 53 Pa.C.S. § 5607(a)(2)-(3) & (17).

We conclude that all of the elements of the planned construction constitute public uses or purposes, with the possible exception of the commercial first floor space, the precise nature of which has not yet been established but may fit into one or more of the listed purposes in Section 5607, Paragraph a(2)-(3) & 17). The effect of the project's multiple planned uses on the propriety of exercising eminent domain is discussed further in the next section.

### B. PRPA Restrictions on Takings

Condemnee argues that the purpose of the taking, even if otherwise lawful under the MAA, may not be effectuated through eminent domain because condemnation for private use is prohibited by PRPA and an exception thereto does not apply. Specifically, Condemnee insists the Trial Court erred in finding that the exception provided by Section 204(b)(7) of PRPA, 26 Pa.C.S. § 204(b)(7), applies here.

In *Kelo v. City of New London*, 545 U.S. 469 (2005), the United States Supreme Court considered the meaning of a "public use" for purposes of eminent domain, within the meaning of the Takings Clause of the Fifth Amendment to the United States Constitution.[12] Explaining that the case "turn[ed] on the question whether the [c]ity's development plan serve[d] a 'public purpose,'" the Supreme Court observed that, "[w]ithout exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field." *Id.* at 480. Further, the Court continued, "[v]iewed as a whole, our

---

[12] The portion of the Fifth Amendment known as the Takings Clause provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

15

jurisprudence has recognized that the needs of society have varied between different parts of the [n]ation, just as they have evolved over time in response to changed circumstances." *Id.* at 482. Applying this deferential standard, the Supreme Court concluded that the city redevelopment project in *Kelo* passed constitutional muster where it was authorized by a Connecticut state statute, even though the developer was a private nonprofit entity formed to assist the city with economic development and the project at issue included taking private property for a project that included a waterfront conference hotel, a "small urban village" with restaurants and shopping, marinas for both recreational and commercial uses, a pedestrian "riverwalk," 80 new residences, a United States Coast Guard Museum, 90,000 square feet of research and development office space, parking or retail services for visitors and/or to support the marina, and office and retail space. *Id.* at 474.

Although *Kelo* established the federal constitutional baseline on public use requirements for eminent domain, the deference to state legislatures applied in *Kelo* means that states are free to impose stricter public use requirements than that imposed under the *Kelo* federal baseline. *Kelo*, 545 U.S. at 489; *In re Condemnation by Redevelopment Auth. of Lawrence Cnty.*, 962 A.2d 1257, 1263 (Pa. Cmwlth. 2008). In 2006, Pennsylvania's legislature did so in PRPA, the express purpose of which is to prohibit takings for private purposes and to "protect the rights of property owners above all other interests . . . ." *Wolfe*, 320 A.3d at 1175 (quoting Pa. Gov. Mess., *Protecting Prop. Owners' Rights* (May 4, 2006)).

Section 204(a) of PRPA prohibits "the exercise by any condemnor of the power of eminent domain to take private property in order to use it for private enterprise." 26 Pa.C.S. § 204(a). We explained in *Nanticoke I*, however, that

> PRPA will not thwart a taking if there is a private benefit
> of any size or nature. While the constitutional analysis

16

often focuses on weighing the respective *benefits* to the public and the private entity, requiring that the public must be found to be the *primary beneficiary* of the project, the analysis under PRPA is slightly different. Under PRPA the focus is on the *purpose* and the *ultimate use* to which the taking is directed. If the genuine purpose of the taking is for a public use, *i.e.*, the public use is the true driving force behind the taking, PRPA is satisfied even if the project results in some private gain.

292 A.3d at 1173 (emphasis original).

Condemnee asserts that the Trial Court erred in concluding that the exception set forth in Section 204(7)(i) of PRPA applies, arguing that the exception "does not apply when property taken is acquired for the development of low-income and mixed-income housing projects pursuant to the Housing Authorities Law (HAL) or to be developed using financial incentives available for the development of low-income and mixed-income housing projects under [Section 42 of the Internal Revenue Code,] 26 U.S.C. § 42." Condemnee Br. at 41 (original emphasis removed). Condemnee contends that the project is a "mixed-use project," not a "housing project," under Section 1543 of HAL, 35 P.S. § 1453 (definitions). This argument is of no avail.

Section 204(b)(7)(i) of PRPA provides an exception from the prohibition on taking private property for use by private enterprise where:

(7) The property taken is acquired for the development of low-income and mixed-income housing projects pursuant to [HAL], or to be developed using financial incentives available for the development of low-income and mixed-income housing projects under:

(i) [S]ection 42 of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. § 42);

26 Pa.C.S. § 204(b)(7)(i). We agree with Condemnee that Paragraph (7) does not facially apply to the part of the project to be devoted to commercial rental.

17

We conclude, however, that another exception from PRPA applies here. Section 204(b)(2)(iii) provides an exception from PRPA's restrictions where space within a project is transferred by any means, including a lease, to a "private enterprise that occupies an incidental area within a public project, such as retail space, office space, restaurant and food service facility or similar incidental area." 26 Pa.C.S. § 204(b)(2)(iii). Here, as indicated previously, the planned project would have five floors, with only part of the first floor to be rented as commercial space. The top three floors would be devoted exclusively to affordable senior housing, the second floor would be a parking garage usable by both residents and the public, and the remainder of the first floor would be a public transportation facility. We agree with the Authority that the commercial use of a portion of the first floor would be "incidental" for purposes of the exception provided at Section 204(b)(2)(iii) of PRPA, under the facts adduced here.

Accordingly, because its primary purpose is low-income senior housing, the project here facially meets an exception to PRPA. As discussed further in the next section, however, the project's ultimate owner will be an as-yet unknown private investor. As the incentive for the investment is the sale of tax credits, that private investor will apparently be a for-profit entity. Therefore, we must determine whether the project still meets the public use requirement where it will ultimately have a private for-profit owner. As explained below, private ownership does not necessarily defeat a public purpose for a taking.

**C. Purpose of the Taking; Primary and Paramount Beneficiary**

"[A] taking will be seen as having a public purpose only where the public is to be the primary and paramount beneficiary of its exercise." *Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 337 (Pa. 2007) (quoting *In re Bruce Ave.*, 266

A.2d 96, 99 (Pa. 1970)). Here, Condemnee argues that the true purpose of the Nantego Project is not a public use or purpose, but to confer private benefits.

The Authority plans to convey the property to New Horizons rather than retaining ownership. Indeed, the Authority is not a participant in the planning, funding, or execution of the project beyond obtaining site control for New Horizons. New Horizons, although created by the NHA, is a private nonprofit entity. Thus, Condemnee maintains that the project's residential, retail, and parking facilities will be privately owned. Moreover, as set forth in detail above, Nantego Development LP is to be formed to own and manage the building once tax credits are acquired. Although New Horizons would be the general partner in Nantego Development LP, a private equity investor would own the vast majority of the limited partnership. The partnership agreement would require approval by the Pennsylvania Housing Finance Agency (PHFA) and would limit what could be done with the building. Nantego Development LP would own the building for the duration of a 15-year compliance period, at which point it would sell the building to either New Horizons or Nantego LLC. Restrictive covenants would be placed on the property which would run with the land and would limit the use of the property to low-income senior housing for a period of time not established in the record; the notes of testimony indicate as little as 4 years and as many as 40.

Condemnee asserts that New Horizons is not bound either to use the property as stated in the Authority's plan or to submit the anticipated application for low income housing tax credits. Condemnee maintains there is a possibility that the property will be used differently from the stated plan because of a lack of restriction on use and, in addition, the planned financing and ownership, which involves an equity investor as limited partner for 15 years and tax credits which have not been

19

applied for as yet. Condemnee insists there is "no factual evidence" to support that the public is the primary beneficiary. Condemnee Br. at 30. Condemnee points to, *inter alia*, the lack of a needs assessment and research into other affordable housing in Nanticoke and other public transportation operations in Nanticoke; the agreement between United Neighborhood and New Horizons splitting the developer's fee; the possibility that United Neighborhood and New Horizons will not apply for low income housing tax credits; the possibility that the property could be used differently to increase the developer's fee; and the unwritten understanding that the Authority would sell the property to New Horizons.

The Authority concedes that its role in the project is solely to establish site control but points out that Condemnee has cited no legal authority to suggest that this function is improper or contrary to law. The Authority contends that the collaboration between it, the City, and New Horizons, is a "model of local agency/governmental cooperation and significant evidence of a 'well-developed plan of proper scope.'" Auth. Br. at 11 (quoting *Lands of Stone*, 939 A.2d at 338).

The Authority asserts that, as a governmental body, it is entitled to deference by the courts in the absence of bad faith, fraud, capricious action, or abuse of power.[13] The Authority responds to the criticism that a needs assessment was not

---

[13] The Authority relies upon *Blumenschein v. Housing Authority of Pittsburgh*, 109 A.2d 331 (Pa. 1954), in which condemnees challenged the suitability of the location for a housing project under the enabling statute for a taking:

> [C]ourts will not review the actions of governmental bodies . . . involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is

20

performed by citing evidence of a need for low income housing found by the Trial Court: Verazin's credible testimony that the City "has over [60%] low-income [sic] as determined by government standards with very few vacancies to provide the residents" and that the NHA's occupancy rate "is consistently in the high [90th] percentile with over [300] applicants on the waiting list that continues to grow monthly." Auth. Br. at 15. The Authority denies that there was evidence produced that would lend credence to Condemnee's theory that the building's use is subject to change, pointing out that neither property owner established an alternative purpose for the taking. The Authority also points out that Fotta testified, and the Trial Court found credible, that the tax credits could not be applied for until site control had been established and that tenants, reasonably, would not commit sight unseen to a building not yet built, on property subject to protracted litigation.

The Authority points to the following as evidence of public purpose: the cooperation among local entities, including the Authority and New Horizons, and municipal government, which exist to serve the public interest; the involvement of two 501(c)(3) corporations with a history of providing low income housing and which would not participate in an enterprise designed to enrich private entities; the meetings with the Authority which took place prior to the Declaration involving photographs and drawings; safeguards including the requirement of review of the partnership agreement by the PHFA and restrictive covenants limiting use to

> limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion.

*Id.* at 335 (emphasis original); *see also Dep't of Transp. v. E-Z Parks, Inc.*, 620 A.2d 712, 718 (Pa. Cmwlth. 1993).

affordable senior housing for 40 years; the City's application and receipt of state grant funding; the witnesses' agreement that the purpose was to construct the building described in the declaration; and that no evidence was presented of a different purpose. The Authority goes on to cite the planned uses of the building as an intermodal transportation center; parking spaces; and housing for low-income seniors.

To reiterate, a taking will be seen as having a public purpose only where the public is to be the primary and paramount beneficiary of its exercise. *Lands of Stone*, 939 A.2d at 337 (quoting *In re Bruce Ave.*, 266 A.2d 96, 99 (Pa. 1970)). A court must "look[] for the 'real or fundamental purpose' behind a taking." *Id.* (quoting *Belovsky v. Redev. Auth.*, 54 A.2d 277, 283 (Pa. 1947)). "Stated otherwise, the **true** purpose must primarily benefit the public." *Id.* (emphasis original). "This means that the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification." *Id.* at 338. The question of what constitutes a public use is "highly fact-dependent." *Reading Area Water Auth.*, *v. Schuylkill River Greenway Ass'n*, 100 A.3d 572, 580 (Pa. 2014); *see also City of Phila. v. Galdo*, 217 A.3d 811 (Pa. 2019) (determination of whether property is devoted to a public use is dependent upon the individualized facts of each case).

In a decision issued after *Nanticoke I*, *Wolfe v. Reading Blue Mountain*, 320 A.3d 1164 (Pa. 2024), our Supreme Court extensively discussed the constitutional meaning of "public use" as it relates to eminent domain in the context of a railroad's attempt to perform a taking for the specific and exclusive benefit of another private business, reiterating its historical holdings on the subject. Of particular importance, the Court stated that "courts must analyze any purported

22

public benefit of the taking while considering the technological, social, and economic landscape 'of the period in which the particular problem presents itself for consideration.'" *Id.* at 1179 (quoting *Dornan*, 200 A. at 840).

Here, although the plans for the project are complex and uncertain as to their final form, there is substantial evidence supporting the Trial Court's findings concerning the public purpose of the taking. Of particular import, the Trial Court found as fact that there is a need for affordable senior housing in Nanticoke and that the primary source for funding for new affordable housing development is tax credits sold to private entities. Condemnee does not dispute these findings.

We acknowledge the collaboration among the Authority, the City, and New Horizons, as an effort to establish a "well-developed plan of proper scope" as that term is applied in *Lands of Stone*, 939 A.2d at 338. Notably, the United States Supreme Court has recognized that ***once a public purpose for a project is established, the means of executing the project are discretionary, and one viable choice "is the use of private enterprise for redevelopment of the area.***" *Berman v. Parker*, 348 U.S. 26, 33-34 (1954) (emphasis added). As the Supreme Court observed, "***[t]he public end may be as well or better served through an agency of private enterprise than through a department of government*** . . . . We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." *Id.* (emphasis added).[14] Thus, the anticipated private ownership of the project here does not automatically negate its public purpose.

---

[14] We note that *Berman* speaks of congressional authorization for a redevelopment project because the redevelopment and eminent domain was taking place in Washington, D.C. and was subject to federal statutes. However, its rationale is equally applicable here.

Nonetheless, we conclude that Condemnee's concerns about New Horizons' obligations for the ongoing uses of the building are well-founded. Neither party has pointed to any evidence in the record establishing a binding written agreement between New Horizons and either the Authority or NHA that assures New Horizons' compliance with the overarching plan. Indeed, as stated above, the ***only*** written agreement found by the Trial Court is that between New Horizons and United Neighborhood. The development plan may well be a product of good faith intentions to produce a building for a public use or purpose, and we acknowledge that some contingency provisions may be necessary in agreements regarding the project, pending its finalization. Such a project, however, should not be authorized and developed on faith; it must be properly documented by binding written agreements in order to assure that the public purpose goes forward as planned. Therefore, we hold that such a plan, however much in the public interest, must be documented by written agreements cementing the duties and obligations of the various parties.

### D. Excessive Taking

Finally, Condemnee claims the Trial Court erred in concluding that the taking was not excessive. Condemnee maintains that the Authority condemned more property than was required to effectuate its purpose, because a portion of the condemned properties will be "subdivided and then conveyed to [PennDOT]" and because the project is to include a "commercial component which is not necessary to carry out its alleged purpose of providing affordable senior living, parking, and affordable transportation for the elderly."[15] Condemnee Br. at 44. In light of our

---

[15] The Declaration lists economic development of the City as an object of the project, Declaration at ¶ 12, R.R. at 4a, but does not specifically mention commercial or retail space. We note that because the commercial space at issue is within the footprint of the five-story building, which includes the stated uses, it is not clear that any land would be taken for the commercial use that would not otherwise be taken if that purpose were not present.

disposition of the appeal, we need not reach this issue, but we address it briefly for completeness. We preface this discussion, however, with the caveat that any determination that the taking was not excessive presumes that there has first been a determination that the taking was otherwise proper – a determination we have concluded the record here does not support.

The Authority contests Condemnee's characterization of the evidence cited, asserting that Fotta did not testify that some of *Condemnee's* land would be conveyed to PennDOT, but that "some of the land that is part of the *Nantego* [*P*]*roject*" would be conveyed to PennDOT, pointing out that several other properties have already been taken. Auth. Br. at 29 (citing R.R. at 318a) (emphasis supplied). The Authority notes that Condemnee did not "press [] Fotta nor inquire further as to whether any portion of the condemned properties of [Condemnee and Nilved] would be transferred to PennDOT." Authority Br. at 29. We agree that it is not clear from the record whether any portion of Condemnee's property, specifically, would be conveyed to PennDOT.

The Authority asserts further that Fotta's testimony established that the street widening which requires the transfer of land to PennDOT is for the purpose of creating a "bus cut out" so that seniors would not have to stand in the street while waiting to board a bus, R.R. at 248a, which the Authority states is a necessary component both of the building and the bus terminal, making the interest taken not greater than necessary to carry out the public purpose. The Authority cites the language of *Westrick v. Approval of Bond of Peoples Natural Gas Co.*, 520 A.2d 9635 (Pa. Cmwlth. 1987), to argue that while the quantum of land to be acquired by the condemnor is within its discretion, that discretion is limited to an "interest that

25

is not greater than is necessary to carry out the public purpose of the body on which such power is conferred," and further, that

> [a]dministrative decisions of a condemnor concerning the amount, location, or type of estate condemned are not subject to judicial review unless such decisions are in bad faith, arbitrary, capricious, or an abuse of power. There is a presumption that the acts of the condemnor are for the public good, and a court will not substitute its discretion for that of the administrative body. It is the condemnee's burden to prove an administrative abuse, and this burden is a heavy one to meet.

*Id.* at 965-66. We agree with the Authority that Condemnee has not demonstrated that a taking related to a bus cutout would be excessive if the project were to move forward with appropriate written agreements.

## IV. Conclusion

Based on the foregoing discussion, the order of the Trial Court is reversed.

_____

CHRISTINE FIZZANO CANNON, Judge

26

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Condemnation by the :
General Municipal Authority :
of the City of Nanticoke :
                                                    :
Appeal of: Estate of Leonard D.    :    No. 681 C.D. 2024
Nardozzo                                       :

# **O R D E R**

AND NOW, this 11th day of December, 2025, the June 28, 2024 order of the Court of Common Pleas of Luzerne County is REVERSED.

_____
CHRISTINE FIZZANO CANNON, Judge